Per CuRiam :
This case was referred pursuant to Eule 45 to Mastin G. White, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed August 2, 1962. On August 20, 1962, defendant filed a motion for adoption of the commissioner’s report as the basis for the court’s judgment in the case pursuant to Eules 46(a) and 48. On September 5,1962, plaintiffs filed a statement of election to submit the case without filing a brief. Thereupon the case was submitted without oral argument. Since the court is in agreement with the findings and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in *334 tills case. Plaintiffs are therefore not entitled to recover and their petition is dismissed.
OPINION OP COMMISSIONER
This action was instituted by 12 plaintiffs to recover $703,550 in damages because of alleged takings by the United States of so-called avigation easements in the airspace over 98 parcels of land. All the lands are situated to the north of, and in close proximity to, a military airfield that forms part of an installation known as the Dallas Naval Air Station.
By agreement of the parties, and with the approval of the commissioner, the trial was limited under Buie 38 (c) to the issues of law and fact relating to the right of the plaintiffs to recover.
The evidence clearly shows — and the defendant frankly conceded at the trial — that the United States has taken avigation easements over all the lands that are involved in the case.
There remains for consideration, however, an affirmative defense asserted by the defendant to the effect that the takings occurred more than 6 years prior to the filing of the plaintiffs’ petition on October 7, 1960, and, therefore, that claims for such takings cannot be maintained in view of the statutoiy provision which declares that “Every claim off which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues” (28 U.S.C. 2501). Also, as to some of the parcels of land that are involved in the case, the defendant has asserted another affirmative defense to the effect that the plaintiffs who sue concerning these lands did not own them at the time of the takings, and, in any event, that such plaintiffs are barred from recovering by the Assignment of Claims Act (31 U.S.C. 203). The affirmative defense based on the statute of limitations will be discussed first.
The Dallas Naval Air Station is located several miles west of Dallas, Texas. It contains an airfield that covers approximately 700 acres of land. There are two runways on this airfield, a north-south runway and a northwest-south *335 east runway. Both of the runways were originally completed in 1941, and they were 5,200 feet in length, at that time. In the spring of 1950, the north-south runway was extended to the south for an additional 2,300 feet; and in 1956, this runway was again extended to the south for an additional 500 feet. The purpose of the 1950 extension was to make the north-south runway safely usable for the operation of jet aircraft from and to the Dallas Naval Air Station. The northwest-southeast runway has never been extended beyond its original length of 5,200 feet.
All the privately owned lands involved in this case are located within the approach zone to, and within the takeoff zone from, the north end of the north-south runway at the Dallas Naval Air Station. The distances of the properties from the north end of the north-south runway vary from about 700 feet to about 3,200 feet.
Prior to 1949, the air traffic at the Dallas Naval Air Station consisted exclusively of flights by propeller-driven aircraft; and flights by such aircraft continued in great numbers during 1949 and thereafter. The north-south runway at the Dallas Naval Air Station has always been the primary runway for propeller-driven aircraft. Throughout the period since the completion of the north-south runway in 1941, propeller-driven aircraft taking off toward the north from, or landing from the north on, the north-south runway have regularly and frequently flown over the plaintiffs’ lands at altitudes of less than 500 feet above the surface of the ground. However, there is no evidence in the record tending to show that such flights have interfered substantially with the use and enjoyment of the plaintiffs’ lands at any time. For that reason, it must be held that the United States did not take avigation easements in the airspace over the plaintiffs’ lands by virtue of the flights by propeller-driven aircraft during the 1940’s and early 1950’s, and that such flights should be disregarded in determining when the claims for the taking of avigation easements over the plaintiffs’ lands first accrued. Highland Park, Inc. v. United States, 142 Ct. Cl. 269, 273 (1958).
There were a few sporadic flights by jet aircraft at the Dallas Naval Air Station in 1949 and early in 1950. After *336 the extension, of the north-south runway in the spring of 1950, however, there was a rapid increase in the number of flights by jet aircraft to and from the installation. By 1954, approximately 50 percent of the 79,585 takeoffs and landings at the Dallas Naval Air Station during the year were by jet aircraft.
Prior to the extension of the north-south runway in the spring of 1950, the few jet aircraft that operated to or from the Dallas Naval Air Station generally used the north-south runway, but there was some use of the northwest-southeast runway by jet aircraft when unusual weather conditions prevailed in the area. After the extension of the north-south runway in the spring of 1950, jet aircraft operating to or from the Dallas Naval Air Station have used only the north-south runway. Due to the direction of the prevailing winds in the area, approximately 30 percent of the takeoffs by jet aircraft have been toward the north, and approximately 70 percent of the landings have been from the north.
The types of jet aircraft that were regularly involved in the flight operations at the Dallas Naval Air Station during the period between the 1950 extension of the north-south runway and the summer of 1954 consisted of the FJ-1 (Fury),FH-l (Phantom), F2H (Banshee), F6I7 (Pirate), F7IT (Cutlass), F9F (Cougar), F-80 (Shooting Star), F-84 (Thunderjet), and T-33. The FH-1 (Phantom), F2H (Banshee), and F7U (Cutlass) were equipped with twin jet engines. The other aircraft mentioned in this paragraph were equipped with single jet engines.
During the early part of the period 1950-1954, none of the aircraft referred to in the preceding paragraph was equipped with an afterburner. However, beginning in 1952, the two jet engines of the F7U (Cutlass) were equipped with afterburners, and the afterburners were subsequently used on all takeoffs by this type of aircraft. In 1953 and 1954, Cutlasses equipped with afterburners were making an average of from 10 to 15 flights per day at the Dallas Naval Air Station.
In 1953 and 1954, jet aircraft of the types previously mentioned, including the F7U (Cutlass) equipped with afterburners, were regularly and frequently flying over the *337 lands involved in this case at altitudes that varied from 50 feet to 200 feet above the surface of the ground, depending upon tire relationship of a particular piece of property to the north end of the north-south runway. These regulax and frequent intrusions at low altitudes into the airspace over these lands occurred immediately after jet aircraft took off toward the north from, or immediately before jet aircraft landed from the north onto, the north-south runway. The takeoffs over these lands were at lower altitudes than might reasonably be expected because there was in effect at the time a regulation of the Dallas Naval Air Station which required jet aircraft taking off toward the north and departing from the station’s control zone to proceed northward at an altitude of 1'ess than 1,000 feet above the surface of the ground until they reached a point about 5 miles north of the station. The purpose of this regulation was to prevent interference with commercial aircraft flying between Love Field at Dallas and the Amon Carter Airport at Fort Worth.
After 1954, there was a further but more gradual increase in the number of flights by jet aircraft at the Dallas Naval Air Station. By 1960, approximately 75 percent of the 123,709 takeoffs and landings at the station were by jet aircraft.
Also, the number of takeoffs by jet aircraft equipped with afterburners increased in 1955. The F8U (Crusader), a single-engine jet aircraft equipped with an afterburner, began to operate regularly at the Dallas Naval Air Station in February 1955, along with the F7U (Cutlass). Regular flights by the F7U were discontinued after December 1955; but about the middle of 1957, the F-86 (Sabrejet), a single-engine jet aircraft equipped with afterburner, began to operate regularly at the Dallas Naval Air Station. After the middle of 1957, the F8U and the F-86 operated regularly at the Dallas Naval Air Station for the remainder of the period that is involved in the present litigation. About 30 percent of all the takeoffs by jet aircraft equipped with afterburners were toward the north; and the afterburners were always on as the aircraft took off.
*338 A jet aircraft with afterburner or afterburners on during takeoff makes a loud, sharp, staccato, “cutting” noise that is oppressive and irritating. As such an aircraft flies over an area at any altitude up to 500 feet above the surface of the ground, conversations on the subjacent lands are impossible, telephones are unusable, radios and televisions cannot be heard, and great turbulence of the air is created, causing structures to vibrate. The noise made by the F8U (Crusader) type of aircraft with afterburner on during takeoff was recorded by means of an electronic device on several occasions in the vicinity of the lands that are involved in the present litigation, and readings that ranged from 115 to 121 decibels were obtained. The record does not contain any evidence with respect to similar recordings of the noise made by the F7U (Cutlass) during takeoff with afterburners on. However, the evidence indicates that the human ear would be unable to detect any difference between the noise made by the F8U with afterburner on during takeoff and the noise made by the F7U under similar conditions, although the F8U is the more powerful aircraft and an electronic device would probably detect some difference between the noise levels. Similarly, to the human ear there is little, if any, difference between the noise made during takeoff by the F-86 (Sabrejet) with afterburner on and the noise made under like conditions by the F7TT or the F8U.
The afterburners on the three types of aircraft referred to in the preceding paragraph are not used when the planes are in the process of landing. The evidence indicates that the noise made by these three aircraft on landing is not appreciably greater than the noise made by other jet aircraft of the types previously mentioned.
The increase as of 1955 in the number of takeoffs at the Dallas Naval Air Station by jet aircraft equipped with afterburners was ameliorated, in so far as the privately owned "lands involved in this case were concerned, by the rescission in February 1958 of the regulation previously mentioned as requiring jet aircraft taking off to the north and leaving the control zone of the Dallas Naval Air Station to maintain a northward course and an unusually low altitude in order to avoid interference with commercial aircraft flying between *339 Love Field at Dallas and the Amon Carter Airport at Fort Worth. After February 1958, jet aircraft taking off to the north and departing from the station’s control zone were generally required to make a right turn before reaching the privately owned lands that are involved in this case. Jet aircraft taking off to the north and remaining within the station’s control zone continued after February 1958 to fly over the plaintiffs’ lands, but there was no prohibition against these aircraft gaining height as rapidly as was feasible. Consequently, after February 1958 there was a decrease in the number and an increase in the height of takeoffs by jet aircraft over the lands involved in the present case. However, regular and frequent takeoffs by jet aircraft over such lands at altitudes of less than 500 feet above the surface of the ground continued.
Flights by jet aircraft over these lands at low altitudes immediately before landing onto the north-south runway at the Dallas Naval Air Station were not affected by the February 1958 change mentioned in the preceding paragraph. Such flights continued to be made over the plaintiffs’ lands at about the same altitudes (i.e., 50-200 feet) as those previously mentioned in connection with landings prior to February 1958.
The claims for the taking of avigation easements over the lands involved in the present case accrued, and the 6-year period of limitations began to run, when regular and frequent intrusions by jet aircraft into the airspace above such lands at low altitudes began to interfere seriously with the use and enjoyment of such lands. Cf. Bacon v. United States, 155 Ct. Cl. 441, 295 F. 2d 936, 938. Upon consideration of the evidence in the whole record, the conclusion seems inescapable that the critical point was reached not later than the time when jet aircraft with afterburners on began to take off regularly and frequently over these lands at low altitudes. The evidence clearly shows that this happened months before October 7,1954, the date of the beginning of the 6-year period that immediately preceded the filing of the petition.
It is undoubtedly true that, at the time when the north-south runway at the Dallas Naval Air Station was extended in 1950 to accommodate jet aircraft and such aircraft com- *340 meneed to operate to and from that runway with some regularity, the owners of the lands with which we are concerned could not know the extent to which jet aircraft would thereafter use the airspace over their lands or the extent of the subsequent interference by such aircraft with the use and enjoyment of the lands. Cf. Klein v. United States, 152 Ct. Cl. 221, cert. denied, 366 U.S. 936. However, this was no longer true in the summer of 1954, for example. As of that time, flights by a number of different types of jet aircraft— such as the FJ-1 (Fury), FH-1 (Phantom), F2H (Banshee), F6U (Pirate), F7U (Cutlass), F9F (Cougar), F-80 (Shooting Star), F-84 (Thunderjet), and T-33 — over these lands at low altitudes had become numerous, regular, and frequent.[1] Moreover, such flights included takeoffs by the F7U (Cutlass) with afterburners on, as this type of aircraft was making an average of 10 to 15 flights per day at the Dallas Naval Air Station in the summer of 1954.
There was no substantial difference between the type of interference with the use and enjoyment of these lands that was occurring in the summer of 1954 and the type that later occurred during the 6-year period that preceded October 7, 1960, since it appears that the jet aircraft which flew over the lands during the latter period did not fly at lower altitudes or make more noise (in so far as measurement by the human ear was concerned) than the jet aircraft which were flying over the lands in the summer of 1954. It is true that, at least during the period 1955-1957, there was an increase in the total number of flights annually by jet aircraft at low altitudes over the plaintiffs’ lands, as compared with the total annual flights for 1954 and preceding years, and there was also an increase in the number of takeoffs over these lands by jet aircraft with afterburners on. However, the evidence in the record does not show that these changes during the critical 6-year period made it impossible for the lands in question to be devoted to uses which had been feasible theretofore. Cf. Davis v. United States, 155 Ct. Cl. 418, 295 F. 2d 931, 933.
*341 It is my opinion, therefore, that the claims for the taking of avigation easements over the lands involved in this case first accrued more than 6 years prior to the filing of the petition on October 7, 1960. Accordingly, such claims are barred by 28 U.S.C. 2501.
The conclusion stated in the preceding paragraph makes it unnecessary to discuss the defendant’s further affirmative defense that some of these lands were not owned by the present claimants at the time when the avigation easements were taken by the United States.
FINDINGS OF FACT
1. (a) At the time of the filing of the petition in this case on October 7, 1960, the plaintiff H. D. Brin (1) was the owner of lots 5-8 in block E of the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas. He acquired the ownership of these lots on August 29, 1960.
(b) Prior to August 29, 1960, and for a period that extended back to a date more than 6 years before the filing of the petition, the lots referred to in paragraph (a) of this finding were owned by the plaintiff B. P. Dabney (6).
(c) Each of the lots referred to in paragraph (a) of this finding contains a so-called duplex, or a residence that is divided into two apartment units. These apartments are rented by the plaintiff H. D. Brin to other persons. They were similarly rented by the plaintiff B. P. Dabney to other persons during the period of his ownership. The duplexes were built in 1951 or 1952.
2. (a) At the time of the filing of the petition in this case on October 7, 1960, and for more than 6 years prior to that date, the plaintiff Anna Jane Dabney (4) was the owner of the following parcels of land situated in the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas: lots 3-13 in block C and lots 14-18 in block E.
(b) At the time of the filing of the petition and for more than 6 years prior to that date, the plaintiff Anna Jane Dabney (4) was the owner of lot 15 in block A of the West-over Place Bevised Addition to the city of Grand Prairie, Dallas County, Texas.
*342 (c) At the time of the filing of the petition, the plaintiff Anna Jane Dabney (4) was the owner of lot 13 in block E of the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas. She became the owner of this parcel of land on May 1, 1959. Prior to May 1, 1959, and for a period that extended back to a date more than 6 years before the filing of the petition, lot 13 in block E was owned by the plaintiffs F. K. Dabney (5), E. P. Dabney (6), and Virginius Dabney (7) as tenants in common, each of them owning an undivided one-third interest in the lot.
(d) All the lots referred to in paragraphs (a) and (c) of this finding are vacant, unimproved lands.
(e) The lot referred to in paragraph (b) of this finding has a single-family dwelling house located on it. This house was built in 1951 or 1952. The plaintiff Anna Jane Dabney rents it to other persons.
.3. (a) At the time of the filing of the petition in this case on October 7, 1960, and for more than 6 years prior to that date, the plaintiff F. K. Dabney (5) was the owner of the following parcel's of land situated in the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas: lots 24 and 25 in block C, lots 1,2,18, and 22 in block D, and lots 1,3, and 4 in block E.
(b) Each of the lots referred to in paragraph (a) of this finding contains a duplex. The apartments in these buildings are rented by the plaintiff F. K. Dabney to other persons. The duplexes were built in 1951 or 1952.
4. (a) At the time of the filing of the petition in this case on October 7, 1960, and for more than 6 years prior to that date, the plaintiff E. P. Dabney (6) was the owner of the following parcels of land situated in the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas: lots 20 and 21 in block C and lots 5, 6, 23, and 24 in block D.
(b) Each of the lots referred to in paragraph (a) of this finding contains a duplex. The apartments in these buildings are rented by the plaintiff E. P. Dabney to other persons. The duplexes were built in 1951 or 1952.
5. (a) At the time of the filing of the petition in this case on October 7, 1960, and for more than 6 years prior to that *343 date, the plaintiff Virginius Dabney (7) was the owner of the following parcels of land situated in the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas: lots 22 and 23 in block C, lots 3,4, and 13-17 in block D, and lots 9-12 in block E.
(b) Each of the lots referred to in paragraph (a) of this finding contains a duplex. The apartments in these buildings are rented by the plaintiff Virginius Dabney to other persons. The duplexes were built in 1951 or 1952.
6. (a) At the time of the filing of the petition in this case on October 7, 1960, the plaintiffs F. K. Dabney (5), E. P. Dabney (6), and Virginius Dabney (7) were the owners of lot 19 in block E of the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas, as tenants in common. Each of these plaintiffs owned an undivided one-third interest in the lot. This ownership had been acquired on May 1,1959.
(b) Prior to May 1, 1959, and for a period extending back to a date more than 6 years before the filing of the petition, lot 19 in block E of the Westover Place Addition No. 2 was owned by the plaintiff Anna Jane Dabney (4).
(c) The lot referred to in paragraphs (a) and (b) of this finding is vacant, unimproved land.
7. (a) At the time of the filing of the petition in this case on October 7, 1960, and for more than 6 years prior to that date, the plaintiffs Anna Jane Dabney (4), F. K. Dabney (5), E. P. Dabney (6), and Virginius Dabney (7) were the owners of lots 20-26 in block E of the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas, as tenants in common. Amia Jane Dabney owned an undivided one-eighth interest, F. K. Dabney owned an undivided seven twenty-fourths interest, E. P. Dabney owned an undivided seven twenty-fourths interest, and Virginius Dabney owned an undivided seven twenty-fourths interest in each of these parcels of land.
(b) Lots 24 and 25 in block E of the Westover Place Addition No. 2 each contains a single-family dwelling house. These houses were built in 1951 or 1952. The plaintiffs named in paragraph (a) of this finding rent the houses to *344 other persons. The other lots referred to in paragraph (a) of this finding are vacant, unimproved lands.
8. (a) At the time of the filing of the petition in this case on October 7,1960, lots 19, 20, and 21 in block D of the West-over Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas, were owned by the plaintiff F. K. Dabney (5) and the estate of S. E. Brin, deceased, as tenants in common, each owning an undivided one-half interest in each of the lots. These lots were acquired by F. K. Dabney and S. E. Brin more than 6 years prior to the filing of the petition. S. E. Brin then died on January 8, 1959. The plaintiff H. D. Brin (1) is the executor of the estate of S. E. Brin.
(b) Each of the lots referred to in paragraph (a) of this finding contains a duplex. The apartments in these buildings are rented by the plaintiff F. K. Dabney and the estate of S. E. Brin to other persons. The duplexes were built in 1951 or 1952.
9. (a) At the time of the filing of the petition in this case on October 7, 1960, lots 1 and 3 in block I of the Westover Place Addition to the city of Grand Prairie, Dallas County, Texas, were owned by the plaintiffs Marita Fanning (8) and Josephine K. Lane (10) as tenants in common. Each of these plaintiffs owned an undivided one-half interest in each of the two lots. This ownership had continued since August 31, 1957.
(b) During the period between December 14, 1955, and August 31, 1957, the plaintiff Josephine K. Lane (10) was the sole owner of the two parcels of land referred to in paragraph (a) of this finding, having obtained such ownership by virtue of a deed dated December 14, 1955, from her mother, Lucy L. Bush. On August 31, 1957, Josephine K. Lane conveyed an undivided one-half interest in each of the two lots to her sister, Marita Fanning.
(c) Prior to December 14, 1955, and for a period of time extending back to a date more than 6 years before the filing of the petition, the two lots referred to in paragraph (a) of this finding were owned by Lucy L. Bush, now deceased.
*345 (d) The two lots referred to in paragraph (a) of this finding comprise half a block that is zoned for commercial use. A single-family dwelling house is located on the half-block area.
10. (a) At the time of the filing of the petition in this case on October 7, 1960, and for more than 6 years prior to that date, the plaintiffs C. F. Newton (11) and F. H. Newton (12), who are wife and husband, were the owners of lots 5-9 in the Jackson, Womack, and Davis Subdivision of the city of Grand Prairie, Dallas County, Texas. These lots are vacant, unimproved lands that are zoned for commercial use.
(b) At the time of the filing of the petition and for more than 6 years prior to that date, the plaintiffs C. F. Newton (11) and F. H. Newton (12), wife and husband, were the owners of lots 1-8 in block A and lots 1-12 in block E of the Westover Place Addition to the city of Grand Prairie, Dallas County, Texas. These lots are vacant, unimproved lands that are zoned for industrial use.
11. (a) At the time of the filing of the petition in this case on October 7, 1960, the estate of S. E. Brin, deceased, was the owner of an undivided one-fourth interest in each of the following parcels of land situated in the Westover Place Addition No. 2 to the city of Grand Prairie, Dallas County, Texas: lots 14-19 in block C and lots 7-12 in block D. The ownership of these interests was acquired by S. E. Brin more than 6 years before the filing of the petition. S. E. Brin then died on January 8, 1959. The plaintiff H. D. Brin (1) is the executor of the estate of S. E. Brin.
(b) At the time of the filing of the petition and for more than 6 years prior to that date, the plaintiff E. Garonzik (9) was the owner of an undivided one-fourth interest in each of the lots referred to in paragraph (a) of this finding.
(c) At the time of the filing of the petition and for more than 6 years prior to that date, the plaintiff Josephine Cummings Brin (2) was the owner of an undivided one-fourth interest in each of the lots referred to in paragraph (a) of this finding.
*346 (d) At the time of the filing of the petition and for more than 6 years prior to that date, the trustees for the Cecile Elise Hozore Trust owned an undivided one-sixteenth interest in each of the lots referred to in paragraph (a) of this finding. The plaintiffs E. C. Brin (3) and E. Garonzik (9) were trustees of the Cecile Elise Hozore Trust at the times indicated.
(e) At the time of the filing of the petition and for more than 6 years prior to that date, the trustees for the Julia Eose Brin Trust owned an undivided one-sixteenth interest in each of the lots referred to in paragraph (a) of this finding. The plaintiffs E. C. Brin (3) and E. Garonzik (9) were trustees of the Julia Eose Brin Trust at the times indicated.
(f) At the time of the filing of the petition and for more than 6 years prior to that date, the trustees for the John Marion Farthing Trust owned an undivided one-sixteenth interest in each of the lots referred to in paragraph (a) of this finding. The plaintiffs E. C. Brin (3) and E. Garonzik (9) were trustees of the John Marion Farthing Trust at the times indicated.
(g) At the time of the filing of the petition and for more than 6 years prior to that date, the trustees for the Carol Hozore Trust owned an undivided one-sixteenth interest in each of the lots referred to in paragraph (a) of this finding. The plaintiffs E. C. Brin (3) and E. Garonzik (9) were trustees of the Carol Hozore Trust at the times indicated.
(h) Each of the lots referred to in paragraph (a) of this finding contains a duplex. The apartments in these buildings are rented by the joint owners to other persons. The duplexes were built in 1951 or 1952.
(i) The plaintiffs E. C. Brin (3) and E. Garonzik (9) died after the petition was filed in this case. No other party has been substituted in behalf of either deceased plaintiff.
J2. (a) Certain of the lots referred to in previous findings are encumbered by deeds of trust or mortgages, as follows:
(1) Deed of trust dated June 20, 1950, filed July 6, 1950, in the sum of $12,486.32 from F. H. Newton and C. E. Newton to Thomas C. Hart, Trustee, for the bene *347 fit of Frank P. [3L] Dabney and others, covering lots 1, 3, 5? 7, 8, 9, 10, 11, and 12, block E, Westover Place Addition, city of Grand Prairie, Dallas County, Texas.
(2) Deed of trust dated August 31, 1951, filed September 13, 1951, in the sum of $26,666 from Frank K. Dabney and others to George B. Golden, Trustee, for the benefit of Acacia Mutual Life Insurance Company, covering lots 1, 3, 4, 9,10, 11, and 12, block E, Westover Place Addition No. 2, city of Grand Prairie, Dallas County, Texas.
(3) Deed of trust dated February 6,1952, filed March 13, 1952, in the sum of $20,500 from Virginius Dabney to George It. Golden, Trustee, for the benefit of Acacia Mutual Life Insurance Company, covering lots 13, 14, and 15, block D, Westover Place Addition No. 2, city of Grand Prairie, Dallas County, Texas.
(4) Deed of trust dated March 5, 1952, filed March 12, 1952, in the sum of $13,667 from Bobert P. Dabney and others to George B. Golden, Trustee, for the benefit of Acacia Mutual Life Insurance Company, covering lots 16, 17, 18, 22, 23, and 24, block D, Westover Place Addition No. 2, city of Grand Prairie, Dallas County, Texas.
(5) Deed of trust dated November 8, 1952, filed November 19, 1952, in the sum of $84,000 from Westover Building Corporation to George B. Golden, Trustee, for the benefit of Acacia Mutual Life Insurance Company, covering lots 20, 21, 22, 23, 24, and 25, block C, and lots 1, 2, 3, 4, 5, and 6, block D, Westover Place Addition No. 2, city of Grand Prairie, Dallas County,
(6) Deed of trust dated May 28, 1954, filed June 1, 1954, in the sum of $7,900 from F. H. Newton and C. F. Newton to Ernest Avery, Trustee, for the benefit of Grand Prairie Savings and Loan Association, covering lots 3, 4, 7, and 8, block A, Westover Place Addition, city of Grand Prairie, Dallas County, Texas.
(b) The Acacia Mutual Life Insurance Company and the Grand Prairie Savings and Loan Association have entered formal appearances in this case.
13. All the lots mentioned in findings 1-11 are situated to the north of a military installation of the defendant now known as the Dallas Naval Air Station. The Dallas Naval Air Station is located several miles west of Dallas, Texas, and covers approximately 1,000 acres of land. Prior to 1949, *348 this installation was known as Hensley Field. It was under tbe control of the Army Air Forces during World War II and until the establishment of the Air Force in 1947, and then it was under the control of the Air Force until 1949. In 1949, Hensley Field was transferred to the Navy, and its name was changed to Dallas Naval Air Station. (For the sake of convenience, this installation will be referred to in subsequent findings as “the Dallas Naval Air Station,” irrespective of whether a particular reference is to a period before or after the change of name in 1949.)
14. (a) A major facility maintained by the defendant at the Dallas Naval Air Station is an airfield that covers approximately 700 acres of land. This airfield contains two runways, a north-south runway and a northwest-southeast runway. Both of these runways were originally completed in 1941, and they were 5,200 feet in length at that time. In the spring of 1950, the north-south runway was extended to the south for an additional 2,300 feet; and in 1956, this runway was again extended to the south for an additional 500 feet. The purpose of the 1950 extension was to make the north-south runway safely usable for the operation of jet aircraft from and to the airfield. The northwest-southeast runway has not been extended.
(b) Prior to the extension of the north-south runway in the spring of 1950, the few jet aircraft that operated to or from the Dallas Naval Air Station (see finding 16(d)) generally used the north-south runway, but there was some use of the northwest-southeast runway by jet aircraft when unusual weather conditions prevailed in the area. After the extension of the north-south runway in the spring of 1950, jet aircraft operating to or from the Dallas Naval Air Station have used only the north-south runway.
(c) The north-south runway at the Dallas Naval Air Station has been the primary, but not the exclusive, runway for propeller-driven aircraft at all times pertinent to this litigation.
(d) Due to the direction of the prevailing winds in the area, approximately 30 percent of the takeoffs by aircraft from the north-south runway at the Dallas Naval Air Station *349 are toward the north, and approximately 70 percent of the takeoffs from that runway are toward the south. Conversely, approximately 70 percent of the landings by aircraft on the north-south runway are from the north onto the north end of the runway, and approximately 30 percent of the landings are from the south onto the south end of the runway.
(e) All the lands referred to in findings 1-11 are located within the approach zone to, and within the takeoff zone from, the north end of the north-south runway at the Dallas Naval Air Station. The industrially zoned lots mentioned in finding 10(b) are situated from 700 feet to 1,700 feet north of the north end of the north-south runway. The commercially zoned lots referred to in findings 9 and 10(a) are situated from 1,800 feet to 2,800 feet north of the north end of the north-south runway. The lots mentioned in findings 1-8 and 11 are situated from 2,300 feet to 3,200 feet north of the north end of the north-south runway.
(f) The title to the airfield at the Dallas Naval Air Station is vested in the city of Dallas. However, at all times material to this litigation, the airfield has been leased by the city of Dallas to the defendant. The term of the current lease extends to the year 2019.
¡15. (a) East of the airfield referred to in finding 14, the defendant maintains at the Dallas Naval Air Station an administration building, hangars, repair and maintenance shops, barracks, officers’ quarters, and other structures.
(b) West of the airfield, there is*at the Dallas Naval Air Station a large Government-owned aircraft manufacturing plant. This plant was constructed in 1941 and was originally leased by the defendant to the North American Aviation Company, which was engaged in the manufacture of propeller-driven fighters and bombers for the Army Air Forces. In 1949, the aircraft manufacturing plant was leased by the defendant to Chance Vought Aircraft, Inc., and this lease arrangement has continued to the present time. Chance Vought has used the plant since 1949 for the manufacture of jet fighter aircraft under contracts with the Navy.
16. (a) The volume of air traffic at the Dallas Naval Air Station is indicated by the following statistics relative to the *350 annual number of takeoffs and landings at that installation during the 11-year period, 1950-1960:
1950_75,492
1951_ 80,280
1952_ 83,454
1953_ 80,561
1954_79, 585
1955_93, 670
1956_101,818
1957_ 81,125
1958_ 98,582
1959_110,257
1960_ 123,709
(b) The air traffic at the Dallas Naval Air Station consists of:
(1) flights by transient aircraft of the Navy; [2]
(2) flights by transient aircraft of the Air Force; [2]
(3) flights by aircraft of the Navy assigned to the Dallas Naval Air Station and flown by pilots of the Naval Eeserve or Marine Corps Eeserve during 1-day, weekend, or 2-week tours of active duty with the Navy or Marine Corps for training purposes;
(4) flights by aircraft of the Air Force maintained at the Dallas Naval Air Station and used by pilots of the Air Force Eeserve during 1-day, weekend, or 2-week tours of active duty for training purposes;
(5) flights by aircraft owned by the defendant and maintained at the Dallas Naval Air Station but assigned to the Texas Air National Guard and operated with the permission of the defendant by Air National Guard pilots for training purposes;
(6) flights by aircraft manufactured at the Dallas Naval Air Station by Chance Yought Aircraft, Inc., under contracts with the Navy and flight-tested with the permission of the defendant by the company’s civilian pilots prior to being delivered to the Navy; and
(7) flights by aircraft manufactured by Chance Yought Aircraft, Inc., under contracts with the Navy and flight-tested by Navy pilots prior to being delivered to the Navy.
(c) There is no evidence in the record showing a breakdown of the air traffic at the Dallas Naval Air Station among the various categories of flights mentioned in paragraph (b) of this finding.
*351 (d) The air traffic at the Dallas Naval Air Station consisted exclusively of flights by propeller-driven aircraft prior to 1949. There were a few sporadic flights by jet aircraft in 1949 and early in 1950, but the vast majority of the flights at the Dallas Naval Air Station continued to be made by propeller-driven aircraft. After the extension of the north-south runway in the spring of 1950, there was a rapid increase in the number of flights by jet aircraft to and from the Dallas Naval Air Station. By 1954, approximately 50 percent of the flights at that installation were by jet aircraft. Thereafter, the percentage of jet flights in relation to flights by propeller-driven aircraft continued to increase on a gradual basis. In 1960, approximately 75 percent of the flights at the Dallas Naval' Air Station were by jet aircraft. As indicated in finding 14(b), all jet operations at the Dallas Naval Air Station after the north-south runway was extended in the spring of 1950 have been to or from the north-south runway.
,17. Throughout the period since the completion of the runways at the Dallas Naval Air Station in 1941, propeller-driven aircraft taking off to the north from, or landing from the north on, the north-south runway have regularly and frequently flown over the lands of the plaintiffs referred to in findings 1-11 at altitudes of less than 500 feet above the surface of the ground. However, such flights by propeller-driven aircraft have not at any time interfered substantially with the use and enjoyment of the plaintiffs’ lands.
18. (a) During the period beginning with the extension of the north-south runway in the spring of 1950 and continuing through the summer of 1954, the military jet aircraft that were involved in the takeoffs from and landings on the north-south runway at the Dallas Naval' Air Station were the FJ-1 (Fury), FH-1 (Phantom), F2H (Banshee), F6U (Pirate), F7U (Cutlass), F9F (Cougar), F-80 (Shooting Star), F-84 (Thunderjet), and T-33. The FH-1 (Phantom), F2H (Banshee), and F7U (Cutlass) were equipped with twin jet engines. The other aircraft mentioned in this paragraph were equipped with single jet engines. During *352 the early part of tbe period referred to in this paragraph, none of the aircraft was equipped with an afterburner. However, beginning in 1952, the two jet engines of the F7TJ (Cutlass) were equipped with afterburners, and the afterburners were used on all takeoffs by this type of aircraft from the Dallas Naval Air Station. After the jet engines of the F7U were equipped with afterburners, this type of aircraft made an average of from 10 to 15 flights per day at the Dallas Naval Air Station.
(b) By the summer of 1954, flights by the jet aircraft referred to in paragraph (a) of this finding had become numerous, regular, and frequent. Such flights comprised about 50 percent of all the air traffic at the Dallas Naval Air Station, which involved a total of 79,585 takeoffs and landings during the year 1954 (see finding 16(a)). Aircraft of the F7U (Cutlass) type equipped with afterburners were making an average of from 10 to 15 flights per day at the Dallas Naval Air Station in the summer of 1954.
(c) During the period referred to in paragraph (a) of this finding, the jet aircraft mentioned in that paragraph used only the north-south runway at the Dallas Naval Air Station for takeoffs and landings. Approximately 30 percent of the takeoffs were toward the north, and approximately 70 percent of the landings were from the north.
19. (a) As of the summer of 1954, jet aircraft of the types referred to in finding 18, including the F7U type equipped with afterburners, were regularly and frequently flying over the lands referred to in finding 10(b) at altitudes as low as 50 feet above the surface of the ground immediately after taking off toward the north from the north-south runway of the Dallas Naval Air Station, and as low as 50 feet above the surface of the ground immediately before landing from the north onto the north-south runway.
(b) As of the summer of 1954, jet aircraft of the types referred to in finding 18, including the F7U type equipped with afterburners, were regularly and frequently flying over the lands referred to in findings 9 and 10(a) at altitudes as low as 100 feet above the surface of the ground immediately after taking off toward the north from the north-south runway at the Dallas Naval Air Station, and as low as 100 feet *353 above the surface of the ground immediately before landing onto the north-south runway.
(c) As of the summer of 1954, jet aircraft of the types referred to in finding 18, including the F7U type equipped with afterburners, were regularly and frequently flying over the properties referred to in findings 1-8 and 11 at altitudes as low as 200 feet above the surface of the ground immediately after taking off toward the north from the north-south runway at the Dallas Naval Air Station, and as low as 200 feet above the surface of the ground immediately before landing onto the north-south runway.
(d) The relatively low altitudes on takeoffs, as indicated in the preceding paragraphs of this finding, were attributable to a local regulation of the commanding officer of the Dallas Naval Air Station which had been in effect since 1950 and which required jet aircraft taking off toward the north and departing from the station’s control zone to proceed northward at an altitude of less than 1,000 feet above the surface of the ground until they reached a point about 5 miles north of the Dallas Naval Air Station. The purpose of this regulation was to prevent interference with commercial aircraft flying between Love Field in Dallas and the Amon Carter Airport at Fort Worth.
(e) The flights by jet aircraft over the lands involved in the case, as indicated in paragraphs (a), (b), and (c) of this finding, were sufficiently noisy to be very disturbing. This was especially true of takeoffs over such lands by the F'TU (Cutlass) type of aircraft with afterburners on.
20. (a) Except for some changes that will be noted in this paragraph, the situation with respect to regular and frequent flights at low altitudes by military jet aircraft over the lands involved in the case, as indicated in finding 19, continued after the summer of 1954 and up until the time of the trial in July 1961. There was a gradual increase in the number of such flights throughout the period.[3] Also, the number of takeoffs over the plaintiffs’ lands by jet aircraft *354 with afterburners on increased in 1955. The F8U (Crusader), a single-engine jet aircraft equipped with an afterburner, began to operate regularly at the Dallas Naval Air Station in February 1955, along with the F7U (Cutlass). Begular flights by the F7U were discontinued after December 1955; but about the middle of 1957, the F-86 (Sabrejet), a single-engine jet aircraft equipped with afterburner, began to operate regularly at the Dallas Naval Air Station. After the middle of 1957, the F8U and the F-86 operated regularly at the Dallas Naval Air Station. In all instances of takeoffs by jet aircraft equipped with afterburners, the afterburners were on as the aircraft took off. However, the increase in the number of takeoffs by jet aircraft equipped with afterburners was ameliorated, as to the lands involved in the present litigation, by the rescission in February 1958 of the regulation referred to in finding 19(d). Thereafter, jet aircraft taking off toward the north from the north-south runway at the Dallas Naval Air Station and departing from the station’s control zone were generally required to make a right turn before reaching these lands. Jet aircraft taking off toward the north from the north-south runway and remaining within the station’s control zone continued after February 1958 to fly over these lands, but there was no prohibition against these aircraft gaining height as rapidly as was feasible. However, jet aircraft on takeoffs to the north continued to fly over these lands regularly and frequently at altitudes of less than 500 feet above the surface of the ground.
(b) Flights by jet aircraft over the plaintiffs’ lands at low altitudes immediately before landing onto the north-south runway at the Dallas Naval Air Station were not affected by the February 1958 change mentioned in paragraph (a) of this finding. Such flights continued to be made over the plaintiffs’ lands at the altitudes indicated in finding 19.
21. (a) A jet aircraft with afterburner on during a takeoff makes a loud, sharp, staccato, “cutting” noise that is oppressive and irritating. As such an aircraft flies over an area at any altitude within the range mentioned in finding 19 — or at any other altitude up to 500 feet above the surface of the ground — conversations on the subjacent land are im *355 possible, telephones are unusable, radios and televisions cannot be heard, and great turbulence of the air is created, causing structures to vibrate. The noise made by the F8XJ (Crusader) type of aircraft with afterburner on during takeoff was recorded by means of an electronic device on several occasions in the vicinity of the lands that are involved in the present litigation, and readings that ranged from 115 decibels to 121 decibels were obtained. The record does not contain any evidence with respect to similar recordings of the noise made by the F7U (Cutlass) during takeoff with afterburners on. However, the evidence indicates that, under similar conditions, the human ear would be unable to detect any difference between the noise made by an F8TJ with afterburner on during takeoff and the noise made by an FTC with afterburners on during takeoff, although the F8U is the more powerful aircraft and an electronic recording device would probably detect some difference between the noise levels. Similarly, to the human ear, there is little, if any, difference between the noise made during takeoff by the F-86 (Sabrejet) with afterburner on and the noise made under like conditions by the FTC (Cutlass) or the F8U (Crusader).
(b) The afterburners on the three types of aircraft referred to in paragraph (a) of this finding are not used when the planes are in the process of landing. The evidence indicates that the noise made by these three types of aircraft on landing is not appreciably greater than the noise made by other jet aircraft of the types mentioned in previous findings.
22. The defendant conceded at the trial that it had taken permanent easements of flight for its aircraft in the airspace over all the lands mentioned in findings 1-11. There was no concession of liability, however, as the defendant contended that the takings occurred more than 6 years prior to the filing of the petition, and that, in some instances, the lands relative to which certain of the plaintiffs sue were acquired by such plaintiffs after the easements of flight had been taken by the United States.
23. Kegular and frequent flights by jet aircraft, operating from the Dallas Naval Air Station at low altitudes over the lands referred to in fundings 1-11 were interfering se *356 riously with the use and enjoyment of such lands before October 7,1954. In addition to regular and frequent flights at low altitudes over such lands by other military jet aircraft of the types referred to in finding 18, the F7U (Cutlass) type of aircraft with afterburners on was taking off regularly and frequently over such lands at low altitudes before October 7, 1954. Such serious interference has continued to the present time, and the evidence indicates that it will continue indefinitely hereafter.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.

 About 50 percent of the? 79,585 takeoffs and landings at the Dallas Naval Air Station in 1954 were by jet aircraft. Hence, the takeoffs and landings by jet aircraft averaged 100 or more per day; and 30 percent of such takeoffs and 70 percent of such landings were over these lands at low altitudes.

 These aircraft are generally traveling cross-country and stop at the. Dallas Naval Air Station for refueling.

 The plaintiffs’ lands were affected by the increase in the total number of takeoffs and landings annually (see finding 16(a)) and by the increase in the percentage of jet flights as compared with flights by propeller-driven aircraft (see finding 16(d)).