Darson H. PERSYN, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 91–1535L.

United States Court of Federal Claims.

Sept. 27, 1995.

Craig L. Austin, San Antonio, TX, for plaintiffs.

Stuart B. Schoenburg, Washington, D.C., for defendant. Major Dawn Scholz and Major David Vercera, Washington, D.C., of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This matter is before the court on defendant's motion for Judgment on Partial Findings, pursuant to RCFC 52(c), made at the close of plaintiffs' case, on all thirty-four claims of an avigation easement by physical taking from overflights of aircraft from Kelly Air Force Base (KAFB or Kelly) in San Antonio, Texas. For the reasons set forth below, the court grants defendant's motion, and dismisses the complaint.[1] In a related

---

1. The court advised the parties at the close of plaintiffs' case at trial that it intended to allow

Order issued today, counsel for plaintiffs is ordered to show cause why he should not be sanctioned for his actions at trial. The court will address the latter Order in conjunction with its Order to Show Cause of January 19, 1995, for unprofessional actions of plaintiffs' counsel that occurred during the pre-trial phase of this litigation.

## FACTS

### A. Background of the Claims

#### 1. History of Kelly Air Force Base

KAFB is located approximately seven miles from the geographic center of San Antonio and surrounded by the city of San Antonio and Lackland Air Force Base. KAFB was established as Camp Kelly in May 1917 and renamed Kelly Field two months later. In December 1917 Kelly was divided into two fields. Pilot training, supply functions and warehouses were located at field No. 1; field No. 2 was used for flight instructor training. In 1925 the Aviation Repair Depot was moved to Kelly No. 1, and the field was renamed Duncan field. From 1925 until 1943 Kelly Field and Duncan Field functioned separately. In March 1943 the flight school was moved to Randolph Field, and Kelly and Duncan Fields were joined as Kelly Field. In January 1948 Kelly Field was renamed Kelly Air Force Base.

The 2851st Air Base Group is the host organization at KAFB; its tenants include a number of organizations including the San Antonio Air Logistics Center (SAALC), the 149th Tactical Fighter Group and the 433d Tactical Airlift Wing. According to an Air Force Study published in 1975, there were an average of fifty-two sorties[2] per day from Kelly in November 1972 through October 1973. In the year ending October 1973, jet aircraft stationed at Kelly accounted for forty-five percent of the sorties; the remaining sorties were performed by transient jet aircraft. The fleet of aircraft stationed at Kelly in October 1973 included the F-100, T-39, C-130, B-52, C-5A[3], F-106, T-30 and the F-5.

On or before 1975, the SAALC became the logistic support manager for the Military Aircraft Command's C-5A Galaxy jet transport fleet. The SAALC also overhauls the Strategic Air Command's B-52 bomber. The KAFB mission includes flight testing in conjunction with depot maintenance of the C-5As and B-52s.

During the 1970s the United States Air Force (USAF) recognized that lands located at the ends of active runways were subject to statistically greater risks of aircraft accidents than lands located elsewhere. Accordingly, the USAF adopted the Department of Defense Air Installation Compatible Use Zone (AICUZ) program designating lands at the end of active runways as being in clear zones or accident potential zones (APZs). The clear zone is a 3,000 foot by 3,000 foot area adjacent to the center line of the runway; it is owned by the USAF. APZ1s are located immediately adjacent to the clear zone. They are the same width as the clear zone, but are 5,000 feet in length. APZ2s are the same width but begin at a distance of 8,000 feet from the end of each active runway and extend to a distance of 15,000 feet from the end of the runway.

In 1979 the 149th Tactical Fighter Group converted from the F-100 aircraft to the F-4C aircraft. By 1981 noise levels for land surrounding KAFB were 175 percent greater than 1975 levels; this increase was attributable to the introduction of the F-4C in 1979. From 1980 through 1986 the F-4C flew approximately ninety operations per day. According to a 1981 Air Force study, there were 444.34 operations per day in 1980[4] or, assuming a five day week, 115,528.4 operations per year. It is not clear from the study whether these were total operations from all aircraft using Kelly in 1980.

---

defendant's RCFC 52(c) motion, and that its findings and conclusions would be formally stated in this written Order.

**2.** A sortie is a total flight mission; it may include any number of operations.

**3.** Early reports refer to the C-5 rather than the C-5A; the two terms are synonymous. *See* JANE'S ALL THE WORLD'S AIRCRAFT 377-78 (John W.R. Taylor ed. 1975-76).

**4.** Although the November 1981 AICUZ report does not identify what year the data was compiled, the parties indicated it reflects 1980 data.

In 1984 an Environment Assessment (EA) was completed for a proposal to convert the 433d Military Aircraft Wing's (MAW) C–130B aircraft to the C–5A aircraft. According to the 1984 EA, annual aircraft operations after the proposed change were expected to increase to 69,921 from 67,585 in 1983.[5] The report concluded that the conversion would cause slightly expanded noise levels to the northwest and southeast of the base, and the Air Force made a finding of No Significant Impact with respect to the proposal to add sixteen C–5As to Kelly's aircraft fleet.

By 1986 the 433d MAW had received only five of the sixteen C–5As originally proposed. A 1986 EA, completed for a proposal to replace eighteen F–4C aircraft with twenty F–16 aircraft, predicted that the sixteen C–5As would conduct twenty-one operations per day, and that annual operations from the sixteen aircraft would account for 5,621 of 89,588 annual operations. There was no evidence to indicate the average daily operations from the five C–5As actually assigned to the 433d MAW by 1986. The 1986 EA reported that "noise impacts of current operations are somewhat lower than those indicated in the [1981] AICUZ report." AIR FORCE LOGISTICS COMMAND, U.S. DEP'T OF THE AIR FORCE, ENVIRONMENTAL ASSESSMENT 33, 35 (1986). There was no evidence that all sixteen projected C–5As were in fact delivered to Kelly.

Until 1985 or 1986 there were two active runways at KAFB. Runway 15/33, built in 1955, is 300′ wide by 11,550′ long. In 1980 more than eighty percent of the flights to or from KAFB took off or landed on runway 15/33. Runway 14/32, which is almost parallel to runway 15/33, was also in use until approximately 1985 or 1986. By 1980 it accounted for only twenty percent of all flight activity at KAFB.

### 2. The Plaintiffs and the Properties at Issue

Plaintiffs are the current owners of thirty-four parcels of land, designated parcels "A" through "II," located adjacent to or near KAFB. Thirty-one of the thirty-four parcels are located to the southeast of KAFB, and three are located to the northwest. All of the parcels at issue in this case are located, at least in part, in the APZs for KAFB runway 15/33. Most of the parcels are also located in the south APZs for runway 14/32.

### B. Proceedings in this Case

On July 15, 1988, plaintiffs filed a complaint in the United States District Court for the Western District of Texas,[6] alleging that their land was "expropriated and damaged" by the United States and the City of San Antonio by "overflight noise and exposure to hazardous activities, and by constitutionally invalid zoning regulations." The combined total of all the claims exceeded sixteen million dollars. The district court subsequently granted the City's motion for dismissal under Fed.R.Civ.P. 12(b)(6), and transferred the claims against the United States to this court.

On November 26, 1991, plaintiffs filed a complaint in this court incorporating the claims that were filed in the district court. On July 1, 1992, plaintiffs filed a first amended complaint, in which they added additional plaintiffs to the caption and specifically invoked the jurisdiction of this court. Plaintiffs filed a second amended complaint on November 23, 1993, alleging that the United States took their properties by: 1) physical invasions of noise, exposure to accidents and low level overflights; 2) engaging in a deliberate campaign to induce fear into the minds of prospective purchasers, with the intent to decrease the market value of the subject properties; and 3) using undue influence to persuade the City of San Antonio to enact a restrictive zoning ordinance applicable to the subject properties.

On April 18, 1994, defendant filed a motion for summary judgment on plaintiffs' claims. By order filed January 19, 1995, the court found there were "genuine issues of fact as to the noise generated by [prior and current] aircraft models, the frequency of flight for

5. Again, it is impossible to tell from the report whether aircraft operations were the total operations from all aircraft using Kelly.

6. J.L. and Herminia Guerra filed suit on December 6, 1989. The district court consolidated the cases.

different models, the altitudes of flight, the hours of flight, the effect on the use and enjoyment of plaintiffs' land, and the damages, if any, attributable to overflights occurring after July 15, 1982." *Persyn v. United States,* 32 Fed.Cl. 579, 584 (1995). Therefore, although it granted defendant's motion for summary judgment as to all other claims, the court denied defendant's motion for summary judgment on plaintiffs' physical takings claims based on alleged low overflights of military aircraft.

At a pretrial conference on May 11, 1995, the court resolved certain disputes related to the admissibility of some of plaintiffs' evidence and discussed, but reserved ruling on, whether two plaintiffs listed as witnesses could testify as experts. Although the parties had not stipulated to any facts in pretrial filings, the court asked whether they could stipulate that Kelly was located in an uncongested area of San Antonio. Plaintiffs' counsel was unwilling to stipulate to this, but stated that the floor for a taking would be flights above 500 feet. Although counsel's statement that the floor for a takings claim would be 500 feet in an uncongested area, the court informed the parties that they should arrange a site visit for the court prior to trial.

At the conference, defendant argued that it was entitled to a directed verdict before trial because there was no evidence upon which plaintiffs could prevail. Based on the exhibits and witnesses listed in plaintiffs' Appendix G filings, counsel's pretrial memorandum and statement of proposed findings of fact, as well as statements made by counsel at the pretrial conference, the court had serious doubts that plaintiffs' counsel understood the applicable law and was prepared to present colorable claims for relief. Although the court determined that plaintiffs should be given the opportunity to go forward, it reiterated the elements that plaintiffs were required to establish to prevail on a claim for taking of an avigation easement. Counsel assured the court that he would prove physical takings after July 15, 1982.

At the May 11, 1995 pretrial conference, defendant agreed to stipulate to ownership of the parcels with the exception of parcels Y, AA, CC and EE. With respect to parcel Y, the complaint listed the owners as: Clara Persyn, George and Irma Verstuyft, Darson and Cleothilde [sic] Persyn, and Henry and Juliana Verstuyft. Defendant alleged that Henry Verstuyft was the sole owner of parcel Y from 1976 through 1993; in 1993 he allegedly executed a deed transferring the property to Caesar Verstuyft. Defendant also alleged that the legal descriptions in the complaint for parcels AA and Z were identical. Further, defendant maintained that although the claim for a taking of parcel CC was filed by Margaret G. Brown as sole owner, she was a joint owner with George Brown until his death on January 8, 1986. Upon his death, half of his interest in the property was transferred to his wife by operation of law (leaving her with a seventy-five percent interest in the property): The remaining interest in the property went in equal shares to his five children. On May 20, 1986, the five children voluntarily transferred their interest to their mother. Defendant also raised objections to parcel EE and plaintiffs' counsel agreed to voluntarily dismiss this parcel from the suit to render the objection moot. Because the parties were unable to stipulate to ownership of parcels Y, AA and CC, the court instructed plaintiffs' counsel that standing and ownership would have to be proved for those parcels.

On June 9, 1995, plaintiffs filed motions to substitute the estate of Darson Persyn as a party, and amend plaintiffs' second amended complaint to: 1) change the caption of the claim to read "Estate of Darson H. Persyn, Dec'd, et al. v. United States;" 2) add the children of George Brown, Dec'd, and Margaret Brown as plaintiffs in this case; and 3) strike the names of Clara Persyn, George and Irma Verstuyft, Darson and Clotilde Persyn, and Juliana Verstuyft as owners of parcel Y. Plaintiffs Henry B. and Rosie R. Garcia also filed a notice of voluntary dismissal under RCFC 41(a)(1)(A). Because these motions were not filed in the clerk's office in Washington, DC, until the last business day before trial, counsel for plaintiffs provided the court with courtesy copies at the opening of trial.

Trial of this case took place on June 12–14, 1995, in San Antonio, Texas. As an initial matter, the court allowed plaintiffs' unopposed motion to substitute the estate of Darson Persyn as a party to this action. Although defendant raised no objection to the motion to substitute the estate of Darson Persyn, it did object to dismissal of plaintiffs Henry and Rosie Garcia pursuant to RCFC 41(a)(1)(A). Specifically, defendant argued that a dismissal under RCFC 41(a)(1)(A) could not be made after service of the answer or response, and dismissal under this section would prejudice defendant in any effort to recover the costs of this suit. The court informed the parties that it would take this matter under advisement, and proceeded to hear opening statements.

The presentation of these thirty-four takings claims was a farce. The claims followed no discernable theory but rather were an amalgamation of rambling, irrelevant testimony completely unsupported by objective evidence. Despite being warned time and again by the court during the pre-trial phase of the case, plaintiffs' counsel insisted upon adhering to a scenario bearing no relation to the actual facts that the court was able to find from its analysis of the entire record. Seven plaintiffs, three of whom lacked personal knowledge of events before July 15, 1982, testified as witnesses. Although plaintiffs were informed that the statute of limitations was an important factor in this case, counsel did not produce a single piece of reliable documentary evidence dated after 1981.[7] Although two of the witnesses, Terry Britton and John Miller, had been identified in Appendix G filings as experts, neither was qualified as an expert at trial. Plaintiffs' counsel did elicit testimony from Mr. Britton regarding his experience in real estate, and asked Mr. Britton if he "considered [him]self as having expert knowledge of commercial real estate in the area that we are talking about [San Antonio]." Counsel did not, however, offer Mr. Britton to the court as an expert in any field, and the court did not consider him to be testifying as an expert rather than a fact witness.

As their sole expert witness, plaintiffs called Mr. Kirby Gholson. Mr. Gholson claimed a background in real estate even though he received his certificate as a state appraiser *thirty minutes* before he was called to the stand. Gholson claimed some undefined involvement in preparing several of the exhibits offered at trial but totally lacked the knowledge or expertise necessary to give the exhibits relevance. Gholson had prepared an "appraisal" of the subject properties, and even offered testimony purporting to be relevant to the height of aircraft flying over the APZs. Defendant objected to the identification of Gholson as an expert witness, but the court reserved ruling on whether Gholson was qualified.

After observing Mr. Gholson's demeanor and listening to his testimony on direct and cross examination, the court was forced to conclude that Mr. Gholson was completely lacking in professional objectivity, integrity or competence. His testimony and report were filled with illogical statements, outright errors, arbitrary decisions and lack of reasonable judgments. Despite the fact that Mr. Gholson testified under oath, the court also identified several outright falsifications in his testimony. Although Mr. Gholson knew the terminology of an expert, the court concluded that he was no more an expert on San Antonio land value, than was the court. In light of the glaring inadequacies in Gholson's report, and the fact that he had been deposed twice before trial, the court cannot find that plaintiffs' counsel was unaware, at the time this witness took the stand, that Gholson's entire testimony would be made up of whole cloth.

After plaintiffs rested, defendant moved for a directed verdict.

**DISCUSSION**

I. *Voluntary Dismissal Under RCFC 41(a)(1)(A)*

As an initial matter, the plain language of RCFC 41(a)(1)(A) only allows a party to unilaterally dismiss itself from a case before the answer or a response is

7. The court notes that defendant introduced, without objection, two Environmental Assess- ments prepared after July 15, 1982, the relevant date for statute of limitations purposes.

served. *See* RCFC 41(a)(1)(A). A dismissal under RCFC 41(a)(1)(A) does not automatically insulate a party from Rule 11 sanctions. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395, 110 S.Ct. 2447, 2455, 110 L.Ed.2d 359 (1990). After the answer or response is served, a plaintiff can be voluntarily dismissed from the action only upon the filing of a stipulation of dismissal under RCFC 41(a)(1)(B), or by court order under RCFC 41(a)(2) "upon such terms and conditions as the court deems proper." RCFC 41(a)(2). In this case plaintiffs' counsel suggested voluntarily dismissing parcel EE after defendant refused to stipulate to the Garcias' ownership and standing. Although defendant did not object to dismissal of the Garcias, the failure to object cannot be interpreted as an agreement to dismissal under RCFC 41(a)(1)(A).

■ Nevertheless, although dismissal under RCFC 41(a)(1)(A) is not available at this time, the court will permit Henry B. and Rosie R. Garcia's voluntary dismissal under RCFC 41(a)(2). Because the motion to dismiss was made on the eve of trial, and more than six years after the complaint was filed, the court deems this dismissal to be with prejudice as to the claims raised in this lawsuit. Further, dismissal of Henry B. Garcia and Rosie R. Garcia does not operate to relieve the Garcias of liability for any judgment of sanctions, up to the time of trial, that may be rendered against plaintiffs in connection with this court's order to show cause.

II. *Amendment to Change the Parties*

■ Plaintiffs' motion to amend the complaint to add George Brown, II, Mary Alice Pons, Richard Brown, Daniel Brown and Margaret R. Brown as plaintiffs in this action is allowed. Under RCFC 21, the court may add parties to an action at any stage upon such terms as may be just. RCFC 21; *see also Goodwyn v. United States*, 33 Fed.Cl. 730 (1995). These parties were allegedly owners of parcel CC from January 1986 through May 1986; at trial plaintiffs alleged that the taking of this parcel occurred on May 1, 1986. Addition will not prejudice defendant or change the course of the litigation, because defendant has had notice of their claims through their mother, Margaret G. Brown. *See Goodwyn v. United States*, 33 Fed.Cl. 730 (1995).

The court further allows plaintiffs' motion to delete Clara V. Persyn, George Verstuyft, Dec'd, Irma Verstuyft, Darson H. Persyn, Dec'd, Clotilde Persyn and Juliana V. Verstuyft as the alleged owners of parcel Y. Because these individuals remain parties to this action through their ownership of other parcels, the deletion as owners of parcel Y does not effect their liability for any sanctions that might be imposed.

The court notes that at the pretrial conference defendant refused to stipulate to ownership of parcels Y and CC, and plaintiffs' counsel was informed that he would have to prove ownership of these parcels and standing to sue. In the absence of a stipulation, plaintiffs' unilateral decision to file a motion to amend the identification of owners of parcels Y and CC did not obviate the requirement that they prove ownership and standing for these parcels.

III. *Dismissal Under RCFC 52(c)*

■ In this court the judge, rather than a jury, is always the trier of fact. Accordingly, there is no provision under the rules of this court for a "motion for directed verdict," and the court will treat defendant's motion as a motion for judgment under RCFC 52(c).

RCFC 52(c) provides that:

If during a trial a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained ... without a favorable finding on that issue....

RCFC 52(c).

■ The standard for judgment under RCFC 52(c) is not identical to the standard for granting a motion for directed verdict pursuant to Fed.R.Civ.P. 50(a). *Cf. Howard Indus., Inc. v. United States*, 126 Ct.Cl. 283, 288, 115 F.Supp. 481, 484–85 (1953) (lesser standard under former rule 41(b)). On a motion for directed verdict in a jury trial the court does not weigh the evidence. Rather it

makes all reasonable inferences and resolves all issues of credibility in the plaintiff's favor, and it must deny the motion if a reasonable jury could find in favor of the plaintiff. *See Brady v. Southern Ry. Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

In contrast, on a motion under RCFC 52(c) the judge, as the sole trier of fact, may weigh the evidence and is not required to resolve all issues of evidence and credibility in the plaintiff's favor. *See Howard Indus.*, 126 Ct.Cl. at 288, 115 F.Supp. at 484–85. As the court noted in *United States v. United States Gypsum Co.*:

When a court sitting without a jury has heard all of the plaintiff's evidence, it is appropriate that the court shall then determine whether or not the plaintiff has convincingly shown a right to relief. It is not reasonable to require a judge, on motion to [for judgment under Rule 52(c) ], to determine merely whether there is a *prima facie* case, such as in a jury trial should go to the jury, when there is no jury—to determine merely whether there is a *prima facie* case sufficient for the consideration of a trier of facts *when he is himself the trier of facts*.... A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right under the due process clause of the Constitution, to hear the defendant's case, or to compel the court to hear it, merely because the plaintiff's case is a *prima facie* one in the jury trial sense of the term.

*United States v. United States Gypsum Co.*, 67 F.Supp. 397, 418 (D.D.C.1946), *rev'd on other grounds*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948) (quoted in *Howard Indus.*, 126 Ct.Cl. at 289–90, 115 F.Supp. at 485–86).

IV. *Taking of Private Property Without Just Compensation*

A. *The Requirement of a Property Interest*

■ It is axiomatic that at the threshold of all fifth amendment takings claims plain-

tiffs must first have a constitutionally protected property interest. *See, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1030–31, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798 (1992). Since *Causby v. United States*, it has been well-settled that a landowner's property interest in the land extends to the airspace directly over the property, to the extent that the airspace can be used to benefit the underlying land. *United States v. Causby*, 328 U.S. 256, 264–65, 66 S.Ct. 1062, 1067–68, 90 L.Ed. 1206 (1946); *see also Lacey v. United States*, 219 Ct.Cl. 551, 553, 595 F.2d 614, 615 (1979). The property interest in the airspace above the land is limited to airspace below navigable limits; there can be no recovery for a taking based on flights within navigable airspace. *Lacey*, 219 Ct.Cl. at 554, 595 F.2d at 616. There is a very limited exception to this rule when the Air Force consciously selects and imposes an egregious burden on a plaintiff's land, *see generally Branning v. United States*, 228 Ct.Cl. 240, 654 F.2d 88 (1981), *aff'd*, 784 F.2d 361 (Fed.Cir.1986), which was not pleaded, and is not the case here.

■ Airspace above 1,000 feet in the congested areas of cities, towns or villages, and 500 feet in uncongested areas, is navigable, or public, airspace, *see* 14 C.F.R. § 91.79 (1982), and the owner of subadjacent land has no claim for compensation for its use. *See, e.g., Lacey*, 219 Ct.Cl. at 554, 595 F.2d at 616. Although counsel for plaintiffs stated unequivocally at the pretrial conference that the properties were located in a congested area, he put on absolutely no evidence at trial to substantiate this claim. Further, based on a pretrial site visit[8] on June 11, 1995, the court finds that the properties involved in this lawsuit are clearly and unquestionably located in an uncongested area. Therefore, to establish a taking plaintiffs had the burden of proving flights below 500 feet over each property.

8. Counsel for both sides participated in the site visit, as did representatives from the Air Force. Representatives for plaintiffs were invited to attend but elected not to do so.

B. *Elements and Burden of Proof on a Claim for Taking of an Avigation Easement* [9]

It is well-settled that "[f]lights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." *Causby*, 328 U.S. at 266, 66 S.Ct. at 1068; *see also Lacey*, 219 Ct.Cl. at 553, 595 F.2d at 615; *Speir v. United States*, 202 Ct.Cl. 1020, 1024, 485 F.2d 643, 646 (1973). To establish a taking of an avigation easement, the plaintiff has the burden of proving that within six years of the date the complaint was filed, the United States began flying directly above the subject property, below navigable airspace, and that those flights were of such frequency that they substantially interfered with the use and enjoyment of the underlying land. *Stephens v. United States*, 11 Cl.Ct. 352, 359 (1986); *see also Hero Lands Co. v. United States*, 1 Cl.Ct. 102, 107, 554 F.Supp. 1262, 1266–67, *aff'd*, 727 F.2d 1118 (Fed.Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 819 (1984).

The answer to the question of when a takings claim has accrued requires the court to consider each element as it relates to the unique facts of a particular case. *E.g., Jensen v. United States*, 158 Ct.Cl. 333, 338, 305 F.2d 444, 447 (1962). Avigation easement claims cannot be tried on a "one size fits all" formula. Each element must be established for each parcel, and evidence of a taking over one parcel in a case does not, without more, support a finding of a taking over other parcels. *See, e.g., id.* at 336–37, 305 F.2d at 445–46; *Adaman Mutual Water Co. v. United States*, 143 Ct.Cl. 921, 924–25, 181 F.Supp. 658, 659–60 (1958); *see also Town of East Haven v. Eastern Airlines, Inc.*, 331 F.Supp. 16, 32–33 (D.Conn.), *supplemented by* 333 F.Supp. 338 (D.Conn.1971) (formula for damages), *aff'd*, 470 F.2d 148 (2d Cir.1972), *cert. denied, City of New Haven v.*

*Town of East Haven*, 411 U.S. 965, 93 S.Ct. 2144, 36 L.Ed.2d 685 (1973).

If frequent low overflights over part of a parcel substantially interfere with the use and enjoyment of the land, the government acquires an easement of flight over the entire tract of land at the lowest level frequently flown. *E.g., A.J. Hodges Indus. Inc. v. United States*, 174 Ct.Cl. 259, 266, 355 F.2d 592, 596–97 (1966). The easement applies to all types of planes that do not substantially increase the burden on the underlying land. *See Avery v. United States*, 165 Ct.Cl. 357, 361, 330 F.2d 640, 643 (1964).

Claims against the United States must be brought within six years of the date they accrue. 28 U.S.C. § 2501 (1988 & Supp. V 1993). This requirement is jurisdictional and must be strictly construed. *E.g., Alaska v. United States*, 32 Fed.Cl. 689, 697 (1995) (citations omitted); *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994) (citations omitted). The complaint in this case was filed on July 15, 1988. Therefore, any claims for a taking before July 15, 1982, would be barred by the six-year statute of limitations.[10] 28 U.S.C. § 2501; *see also Boardman v. United States*, 180 Ct.Cl. 264, 266, 376 F.2d 895, 896–97 (1967), *cert. denied*, 390 U.S. 953, 88 S.Ct. 1046, 19 L.Ed.2d 1145 (1968); *A.J. Hodges*, 174 Ct.Cl. at 262, 355 F.2d at 594.

Kelly was established as a permanent base in 1917, and jet aircraft have been flying from the base at least since the 1970s. In an effort to circumvent the looming issue of the statute of limitations, plaintiffs argued that their claims did not accrue until the number of overflights reached their highest point. Only then, they argued, could the extent of the damage be ascertained. In support of this argument, plaintiffs cited *United States v. Dickinson*. *Dickinson*, is however, inapplicable to the case at bar. In *Dickinson*, the United States gradually flooded plain-

---

9. The court notes that the expression "avigation easement" in a fifth amendment takings case is a term of art. It is not an easement in the generally understood sense of the word. The term is used to describe what the United States takes when low and frequent flights of government aircraft substantially interfere with the use and enjoyment of underlying land.

10. Although it is not relevant to the outcome of this case, the court notes that J.L. and Herminia Guerra needed to prove that the alleged taking occurred after December 6, 1983.

tiff's land. *United States v. Dickinson*, 331 U.S. 745, 746–47, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947). The Supreme Court held that plaintiff could wait to sue until the final consequences of the flooding were apparent, and plaintiff could then determine what had been taken. *Id.* at 749, 67 S.Ct. at 1385. There are several problems with plaintiffs' theory of the time of accrual.

First, *Dickinson* was a flooding case, *id.* at 746–47, 67 S.Ct. at 1383–84, not an overflight case. In *Applegate v. United States*, the court stated that *Dickinson* "set forth the standard for accrual in cases alleging takings of a continual nature." *Applegate v. United States*, 25 F.3d 1579, 1581 (Fed.Cir.1994). The court went on to explain, however:

> The expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by *flooding* when it was uncertain at what stage in the *flooding* operation the land had become appropriated to public use.

*Id.* at 1582 (emphasis added) (quoting *United States v. Dow*, 357 U.S. 17, 27, 78 S.Ct. 1039, 1047, 2 L.Ed.2d 1109 (1958)). The Federal Circuit recently reiterated this interpretation of *Dickinson*, noting that "in *Dow*, the Supreme Court 'more or less limited [*Dickinson*] to the class of flooding cases to which it belonged....'" *Fallini v. United States*, 56 F.3d 1378, 1381 (Fed.Cir.1995) (quoting *Kabua v. United States*, 212 Ct.Cl. 160, 165, 546 F.2d 381, 384 (1976), *cert. denied*, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977)).

The second problem with plaintiffs' theory is that although a handful of courts have purported to follow the reasoning of *Dickinson* to determine when a cause of action for taking by low overflights accrues, *none* of those courts have held that the number of low overflights must peak before the takings claim accrues. *See Lacey*, 219 Ct.Cl. at 559–60, 595 F.2d at 618–19; *Aaron v. United States*, 167 Ct.Cl. 818, 822–23, 340 F.2d 655, 657–58 (1964); *Aaron v. United States*, 160 Ct.Cl. 295, 299–300, 311 F.2d 798, 800–01 (1963); *Klein v. United States*, 152 Ct.Cl. 221, 223–24, 1961 WL 8726, *cert. denied*, 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 847 (1961).

The third problem with application of plaintiffs' "Dickinson stabilization theory" for accrual of avigation easement claims is that it would lead to grossly unfair results for many innocent landowners. The necessary corollary to a rule that claims do not accrue until the level of flights has peaked is that claims for the taking of an avigation easement would also not be ripe for review until the number of aircraft operations reaches a "high water mark." *But see Dickinson*, 331 U.S. at 749, 67 S.Ct. at 1385 (Court not called upon to decide if claim would be barred). The United States as sovereign has the right to take private property for public use. The only limit on this right is the requirement that the United States pay just compensation for the property taken. Aggrieved landowners cannot evict the United States; their only remedy is to file suit for compensation under the Tucker Act. Under plaintiffs' "Dickinson stabilization theory," landowners who are deprived of the use and enjoyment of their property may have to suffer the loss for years before their claim is ripe for review. In theory, the United States could even prevent claims for just compensation from ever ripening by continually increasing the level of intrusion.

■■■ For these reasons, the court rejects plaintiffs' argument that *Dickinson* applies in avigation easement cases beyond the general principle that a claim for taking based on continuing acts of physical invasion does not accrue until the extent of the invasion and the degree of interference is known or should be known. *See Aaron*, 167 Ct.Cl. at 824, 340 F.2d at 659. The overwhelming weight of authority holds that in a case of a taking by low overflights, the extent of the invasion and the degree of interference is ascertainable when the United States *begins* to operate its aircraft at low elevations and with such frequency that they substantially interfere with the use and enjoyment of the land, with the intent to continue such flights indefinitely. *See, e.g., A.J. Hodges*, 174 Ct.Cl. at 265–66, 355 F.2d at 596. To constitute a taking, it is not necessary that the flights continue for a precise period of time. *See, e.g., Speir*, 202 Ct.Cl. at 1024–25, 485 F.2d at 646–47; *Aaron*, 160 Ct.Cl. at 299, 311 F.2d at 800–01; *Klein*, 152 Ct.Cl. at 224; *Matson v. United*

*States,* 145 Ct.Cl. 225, 229, 171 F.Supp. 283, 286 (1959).

### C. *Plaintiffs Failed to Prove a Taking by Low Overflights*

#### 1. *Parcel A*

Parcel A is a 23.59 acre parcel to the southeast of KAFB; it is located in APZ1 and APZ2 for runway 15/33. In addition, it is located in the APZ zones for runway 14/32. Plaintiff Clotilde Persyn and her husband Darson Persyn (now deceased) moved onto parcel A on May 1, 1935 and used the property as a residence and for farming. After Mr. and Mrs. Persyn moved onto parcel A, it was intersected by the Laredo Highway. The property is improved by a house and barn; both are located on the south side of the Laredo highway.

 Mrs. Persyn's testimony, that aircraft fly between her house and the barn, and right over her head, was sufficient to support a finding that aircraft from Kelly fly directly over parcel A on takeoff and landing. Further, testimony regarding objects which have fallen on parcel A over the years, from before World War II, is also credible evidence that aircraft pass directly over parcel A.

 Although plaintiffs established flights directly over parcel A, there was no credible objective evidence that the aircraft flying over parcel A did so at altitudes less than 500 feet. Although Mrs. Persyn alluded to flights of the "shuttle" [11] and the C–5A right over her head, this testimony was insufficient evidence of the altitudes of those planes. A court should not accept the uncorroborated testimony of a plaintiff that aircraft flew at elevations of less than 500 feet to prove that flights were below navigable airspace because of the difficulties in determining the altitude of a plane from the ground. *Aaron,* 160 Ct.Cl. at 315 (opinion of Commissioner). Mr. A.C. Lopez also testified that when he visited his mother at her home on a nearby parcel, the C–5A flew over at such low altitudes that he could see its

"nuts and bolts." With the assistance of plaintiffs' counsel, he subsequently changed this testimony to state that he could see "rivets." Based upon its observations, the court was insufficiently satisfied with Mr. Lopez's credibility to accord weight to his testimony.

The only other "evidence" of the altitude of aircraft came from a dubious exercise performed by Kirby Gholson, plaintiffs' totally discredited appraiser. Plaintiffs' counsel at one point offered Gholson as an expert mathematician to "calculate" the height of triangles with bases of 3,000 feet, 8,000 feet and 15,000 feet, assuming two-and-one-half and three degree angles. The angles used were based on a 1981 AICUZ study that alternately referred to the "glide slope angle," the "glide slope" and the "angle." The terms "glide slope" and "glide angle" are, however, not interchangeable. The glide slope refers to "the downward path an airplane is directed to follow when it cannot see the ground and is landing on instruments." *Dick v. United States,* 144 Ct.Cl. 424, 426, 169 F.Supp. 491, 493 (1959). In contrast, the glide angle is the "minimum angle of approach with any degree of safety. Airplanes never fly this low unless they are in trouble and cannot help it." *Id.* at 427, 169 F.Supp. at 493. It is not clear whether the 1981 study is referring to the glide slopes or the glide angles, and there was no testimony, expert or otherwise, on this issue to assist the court. Further, the glide slope and the glide angle are only applicable when an aircraft *approaches* a runway to land; neither has any bearing on the altitude of an aircraft on takeoff. *See id.* at 426–27, 169 F.Supp. at 493. Because of prevailing winds, however, only twenty to thirty percent of the flights over parcel A are landings. As to the remaining seventy to eighty percent of flights, plaintiffs' purported mathematical exercise had absolutely no bearing whatsoever.

Moreover, even as to the landings, there was no evidence that the glide angles in the 1981 study were applicable to all aircraft types, *compare id.* at 433 (finding of fact that

---

**11.** It was not clear from the testimony to what "shuttle" Mrs. Persyn was alluding, though the court suspects it was the NASA space shuttle that

is transported cross-county on the back of a C–5A.

approach angle is determined by characteristics of aircraft), on all missions, *compare Lacey*, 219 Ct.Cl. at 558, 595 F.2d at 618 (different altitude for "touch and go" and "field carrier landing practice" patterns), or whether aircraft using these glide angles followed a straight line descent.

Even if this court could believe Gholson's demonstration, there was no evidence whatsoever to establish the starting point for this calculation, i.e., where did the angle originate—at the end of the runway or in the middle. *Compare Jensen*, 158 Ct.Cl. at 354 (finding of fact that normal practice for B–47 on touch and go exercise is to land 3,000 feet from end of runway). The only certainty in this formula is that aircraft do not regularly land, or take-off, at the very end of a runway.

Further, even if the court knew at what point each aircraft model touches down on landing at KAFB, in the absence of evidence establishing the distance of each parcel from this point, plaintiffs' calculations are without context. Parcel A is located partially in APZ1 which begins and ends 3,000 feet and 8,000 feet from the end of runway 15/33. There was no evidence, however, establishing the distance from the point at which aircraft first pass over parcel A to runway 15/33.[12]

There was also no attempt made to show that the glide angles in the 1981 study were relevant to aircraft operating at any time after 1980. Even if the court were willing to make all the assumptions required to make Gholson's demonstration valid, however, it would necessarily have to conclude that aircraft landing at Kelly after July 15, 1982 did not fly at lower altitudes than aircraft arriving at Kelly before July 15, 1982.

Finally, plaintiffs also did not show the kind of egregious circumstances that led the court in *Branning* to find a taking even though flights were not below navigable airspace. In *Branning*, heavy jet aircraft were flown nose to tail in a racetrack pattern, at maximum power, over plaintiff's land. *Branning*, 228 Ct.Cl. at 242, 654 F.2d at 90. Although the Air Force could have performed this maneuver somewhere else, it decided not to do so. *Id.* at 242, 654 F.2d at 90.

The court in *Branning* noted that its finding of a taking "turn[ed] on the peculiar facts the trial judge has found." *Id.* at 242, 654 F.2d at 90; *see also Stephens*, 11 Cl.Ct. at 360. The flights that form the basis of the claims in this case are ordinary takeoffs and landings by single aircraft; there was no allegation or evidence of any racetrack patterns performed by multiple aircraft. Although it is within the realm of possibility that the approach and landing patterns could be varied slightly, the Air Force cannot be said to have "consciously singled out" plaintiffs' lands in the same sense as occurred in *Branning*.

 Even if the evidence established that flights over parcel A were below 500 feet (and ignoring for the moment the statute of limitations problems with respect to the height of the planes), the United States is not liable for the taking of an avigation easement based on occasional flights only. *See, e.g., Mid-States Fats & Oils Corp. v. United States*, 159 Ct.Cl. 301, 309, 1962 WL 9324 (1962). There is no set formula to determine when flights by an aircraft become sufficiently "frequent" to trigger a taking, and the number of aircraft must be considered in light of the type of aircraft flown. *See Brin v. United States*, 159 Ct.Cl. 332, 335–36, 339–40, 1962 WL 9271 (1962); *see also Lacey*, 219 Ct.Cl. at 559, 595 F.2d at 618–19; *Aaron*, 160 Ct.Cl. at 299, 311 F.2d at 800–01; *Highland Park, Inc. v. United States*, 142 Ct.Cl. 269, 270–71, 161 F.Supp. 597, 598–90 (1958). Although different aircraft models were used at Kelly over the years, there was no evidence of the differences between the aircraft such as the number of engines, the maximum thrust, the aircraft load or the noise generated by each model as it passed overhead. *Compare Lacey*, 219 Ct.Cl. at 557, 595 F.2d at 617 (F–9 aircraft generates 7,250 lbs of thrust and 108 decibels of noise when passing overhead at 1,000 feet).

At trial Mr. Miller was permitted to read to the court, from a document he did not prepare, that there were 221,688 total landings and takeoffs from Kelly in fiscal year 1967. Counsel for plaintiffs did not even attempt to authenticate the document in any

---

12. Mrs. Persyn did testify that the parcel is "about" one mile south of Kelly.

way, and it was not introduced into evidence. Accordingly, the court attaches no weight to this testimony. Plaintiffs also produced a 1975 AICUZ study that reported fifty-two sorties per day for the principle aircraft using Kelly in the year ending October 1973. Because a sortie is a total flight mission, and may include a number of operations, this information has no usefulness in the absence of supporting and explanatory testimony or evidence, which counsel for plaintiffs did not proffer.

A 1981 AICUZ study was introduced into evidence. According to that study there were approximately 115,528.4 operations, assuming a five day week, from Kelly in 1980. Although there were two active runways at Kelly in 1980, eighty percent of the flight activity was from runway 15/33. Further, although runway 14/32 was used twenty percent of the time, its south APZs overlapped the south APZs for runway 15/33. Therefore, as to parcel A, which is located to the southeast of Kelly, it was immaterial whether the aircraft used runway 15/33 or 14/32. In both cases, the flights were over parcel A. As the court has previously noted, seventy to eighty percent of these flights are takeoffs and twenty to thirty percent occur on landing. If the court assumes that half of the total operations were over the north APZs and half were over the south APZs, there were 57,764.20 operations in 1980 over parcel A. The court notes that this number of operations by jet aircraft is far more than the minimum needed to trigger a taking. *Compare Aaron,* 160 Ct.Cl. at 299, 311 F.2d at 800 (taking based on ten to twelve flights per day).

Plaintiffs offered absolutely no evidence at trial of the number of operations at Kelly in 1981 or 1982. A 1984 EA reported 67,585 operations in 1983, half of which could have been over parcel A. Subsequent to 1983

figures, there was no evidence of actual operations. Instead, defendant produced, without objection, a 1986 EA that projected 89,588 operations after sixteen C-5As were delivered to the 433d MAW.[13] Even if the court assumes the 89,588 operations listed in the 1986 EA represented actual operations, an assumption the court is unwilling to make, however, only 44,794 would have been over parcel A.

Based on the lack of evidence of the number of aircraft operations at Kelly, the court cannot make any findings regarding the frequency of flights. Nevertheless, the court notes that the limited evidence proffered by plaintiffs, directly contradicts plaintiffs' own claims that the number of aircraft operations peaked after July 15, 1982. To the extent plaintiffs' evidence of the number of flights over parcel A has any relevance, the court must conclude that by 1981 at the latest, there were sufficient flights by jet aircraft over parcel A to trigger the takings clause.

In order to have a compensable taking, the noise and disturbance from frequent low flying planes must substantially interfere with the use and enjoyment of the underlying land. *See Causby,* 328 U.S. at 261, 66 S.Ct. at 1066; *Bodine v. United States,* 210 Ct.Cl. 687, 688, 538 F.2d 348 (1976). Plaintiffs argued that even though parcel A has been located in the shadow of a busy Air Force base for over thirty years, there was no substantial interference from overflights until after July 15, 1982.[14] The court should not give decisive weight to unsupported allegations made by interested parties that flights of aircraft did not interfere substantially with the use and enjoyment of the land until after July 15, 1982. *Jensen,* 158 Ct.Cl. at 339, 305 F.2d at 447. Nevertheless, to the extent these allegations are "consistent with

---

13. The court notes that the number of operations were listed in a table titled "Current Aircraft Operations," and the EA states that "[c]urrent average daily operations are summarized in Table 3.1." Air Force Logistics Command, U.S. Dep't of the Air Force, Environmental Assessment 31 (1986). The EA also states that "[t]he operations summarized in Table 3.1 represent the projected number of operations that would occur on an average busy day when the 433d MAW has re-

ceived the total of 16 C-5A aircraft currently programmed." *Id.*

14. Actually, plaintiffs took the position that there was no interference before 1985 or 1986. Because July 15, 1982 is the relevant date for statute of limitations purposes for the majority of plaintiffs, the court has used that date in its analysis.

[any] known objective facts [such testimony should] be given considerable weight, particularly in the absence of adequate countervailing proof that there was actually a greater effect from these flights than plaintiffs admit." *Id.* at 339, 305 F.2d at 447.

As the court previously noted, parcel A has been used as a residence and farm since at least 1935, and it is improved by a house and barn. The Persyns farmed the land themselves until Mr. Persyn became ill. Since that time, the land has been rented for agricultural use to a person who was not identified at trial. Clotilde Persyn continues to live on parcel A.

There was no evidence that overflights of aircraft from Kelly have had any impact on the agricultural use of parcel A. *Compare Causby v. United States,* 104 Ct.Cl. 342, 349, 60 F.Supp. 751, 755 (1945) (noise from low flying aircraft caused chickens on chicken farm to fly into wall and die), *rev'd on other grounds,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). Although Mrs. Persyn testified that it was no longer profitable to use parcel A for farming, she attributed this fact to its relatively small size rather than interference from aircraft. *Compare A.J. Hodges,* 174 Ct.Cl. at 269–70, 355 F.2d at 599 (noise from low flights of B–52 interrupted farm work).

There was evidence that parcel A is subject to a statistically greater risk of accidents from aircraft flying overhead than land not located in the approach zone of an airport. If this factor were linked to frequent and low overflights, it would be a consideration in determining whether there has been substantial interference. In this case, however, there was no evidence to link the risk of accidents to low flying aircraft. Further, even if the risk of accidents could be attributed to frequent low level flights, it is clear the risk existed long before July 15, 1982, and there was no evidence that the risk increased after that date. *See Boardman,* 180 Ct.Cl. at 270, 376 F.2d at 899 (no reason to believe risk of accidents varies with height, type, number or noise of aircraft). Mrs. Persyn highlighted this fact by recalling that two planes collided over parcel A during the 1930s. The pilot was killed in the accident and his body, along with his helmet that had been shredded by the propeller, was found amid the muddy irrigation fields. Further, through the years, numerous items, including a canopy in 1966, have fallen from aircraft passing over parcel A. There was no testimony that any items fell on parcel A, or any aircraft crashed over or on parcel A, after 1982.

To the extent that the noise levels on parcel A were caused by frequent low overflights, these high noise levels adversely affected the use and enjoyment of parcel A as a residence. Based on the objective evidence, however, the court is forced to conclude that noise substantially interfered with the residential use and enjoyment of parcel A at least by 1981.

█ Day Night Average Sound Levels (DNL) are a measure of the external noise environment at a particular location. *See* 24 C.F.R. § 51.103 (1995). DNL sound levels include an adjustment for the number of single noise events and the time of day of those events. Under government standards in effect in April 1982 land that was either partially or completely in areas with sound levels exceeding 65 DNL was generally considered unsuitable for residential use. *See, e.g.,* 24 C.F.R. § 51.104 (1982). The mere fact that a property is subject to high noise levels as a result of aircraft operations will not establish liability for a taking if there is no showing that the noise is caused by frequent and low overflights. *See Branning,* 228 Ct.Cl. at 252, 654 F.2d at 96. If the remaining elements of a taking are established, however, evidence of high noise levels will be relevant to determine whether there has been substantial interference with the use and enjoyment of the land. *Id.* at 252, 654 F.2d at 96.

In 1980 noise levels on parcel A ranged from 75–80 DNL. Because there was no credible evidence of the altitude of aircraft as they passed over parcel A, the court is unable to conclude that there was a taking. The court notes that if plaintiffs had established that the noise levels on parcel A were caused by aircraft as they flew low over the property, the takings claim for parcel A would have accrued by 1981 at the latest.

## 2. *Parcel B*

 Parcel B consists of 3.185 acres of a larger 19.433 acre tract. The portion of the tract that is part of this lawsuit is in the southwesternmost corner of APZ2. The extended centerline of the runway does not cross parcel B at any point. Damage to property from flights that are not directly over the land are not compensable under the takings clause; rather, "the inconvenience and injury to the property [is] 'incidental' and 'unavoidably attendant' to the use of the airways." *Avery,* 165 Ct.Cl. at 362, 330 F.2d at 643 (citations omitted); *see also Batten v. United States,* 306 F.2d 580, 585 (10th Cir. 1962) (in absence of invasion of airspace directly over property, "distinctions which the Supreme Court has consistently made between 'damages' and 'taking' control and compel denial of recovery"), *cert. denied,* 371 U.S. 955, 83 S.Ct. 506, 9 L.Ed.2d 502 (1963); *Town of East Haven,* 331 F.Supp. at 31–32. The cases in this court do not establish a test for when flights can be considered "directly" over property. In *Town of East Haven,* however, the court applied a test of reasonableness, noting that planes were "pass[ing] so very close to these properties, if not directly over them, as to make it seem like unrealistic nitpicking to deprive these plaintiffs of the benefit of the *Causby* rule." *Town of East Haven,* 331 F.Supp. at 33.

Parcel B is located in APZ2 south, and Mildred Baecke testified that there were flights over this property. Because the APZs are 3,000 feet wide, at its closest point parcel B is necessarily within 1,500 feet of the center line of runway 15/33. Runway 15/33 is only 300 feet wide, however, and no evidence was introduced regarding the distance of parcel B from the runway center line, the flight paths of aircraft on takeoff or approach, the degree (if any) of deviation from the center line of the runway on takeoff or landing, or the wingspan of aircraft flying to and from KAFB. *Compare Dick,* 144 Ct.Cl. at 434 (finding of fact that wingspan of B–47 is 116 feet; wingspan of KC–97 is 141 feet). In light of the distance of parcel B from the base and the center line of the runway, the court notes that the evidence of flights directly over the property is not very compelling. Nevertheless, for the purposes of this opinion the court assumes that aircraft flying north toward Kelly and south from Kelly, fly "directly" over parcel B.

Even if the court assumes that flights to and from Kelly were directly over parcel B, plaintiffs' claim for a taking of airspace over parcel B must fail for several reasons. First, as with parcel A, there was no credible evidence of the height of aircraft flying over parcel B. The court notes that at its closest point parcel B was almost 15,000 feet from the south end of runway 15/33. Even under Kirby Gholson's skewed demonstration (to which the court attaches no weight for the reasons given above), aircraft approaching Kelly over parcel B would have been at altitudes far greater than 500 feet.

Further, as with parcel A, the minimal evidence available of the frequency of flights, if believed, would establish that the number of operations was sufficient to trigger the takings clause by 1981, and actually *decreased* in 1982 and thereafter. In addition, from 1952 until 1994 Mildred and Florent Baecke lived in a house located on the portion of the 19.433 acre tract that is outside this suit. Although they owned the land that the house was situated on, they did not own the remainder of the tract, including parcel B, until 1985 when Mr. Baecke inherited the land from his parents. It appears from the evidence at trial that parcel B was used for agricultural purposes by Mr. Baecke's parents. As with parcel A, there was no evidence that overflights from aircraft had any impact on the use of parcel B for agricultural purposes.

Like parcel A, parcel B has been subject to high noise levels for a number of years, although to a lesser extent. In 1971 Mr. Baecke's parents tried to sell parcel B along with other land that is not part of this suit but is part of the larger tract. The sale was canceled after the Federal Housing Administration (FHA) notified the buyer that FHA financing would not be available due to high noise levels. Moreover, in 1980 noise levels on parcel B were in excess of 70 DNL. Therefore, the court finds that the highest and best use of parcel B was something other than residential by 1981.

### 3. *Parcels J and K*

██ Parcel J is a 15.874 acre parcel located to the southeast of KAFB; it is located in APZ2 south. Parcel K is part of a 8.79 acre parcel located to the southeast of KAFB; 8.099 acres are located in APZ2 adjacent to parcel J. 4M Properties purchased parcel J in October 1984. In February 1985 Terry Britton purchased parcel K in partnership with Somerset Joint Venture. Because 4M Properties, and Terry Britton and Somerset Joint Venture, did not own the subject properties until October 1984 and February 1985, none of those parties have standing to sue for any taking that might have occurred before those dates. *See, e.g., United States v. Dow,* 357 U.S. 17, 20, 78 S.Ct. 1039, 1043–44, 2 L.Ed.2d 1109 (1958).

The only testimony at trial regarding flights directly over parcel J and K came in response to a question on cross examination. On cross examination Mr. Britton was asked whether, before purchasing parcels J and K, he anticipated that aircraft taking off and landing at Kelly would fly over the properties. His response was, "Yes," he did anticipate such flights prior to purchase. Although the paucity of evidence offered on this issue was indicative of the manner in which this entire case was tried, the court assumes for the purpose of this analysis that aircraft from Kelly flew directly over parcels J and K. Because parcels J and K are located south of Kelly, approximately seventy percent of these flights would have occurred on takeoff.

Even if the court assumes that the flights from Kelly were directly over parcels J and K, however, plaintiffs' claims for a taking of airspace over these parcels nevertheless must fail. First, as with parcels A and B, there was no evidence of the height of aircraft as they took off over parcels J and K, and the only evidence of the distance of the parcels from the base was testimony that the parcels were approximately two miles from Kelly. Second, the only evidence, credible or otherwise, regarding the altitude of the thirty percent of the landings over parcels J and K required a finding that aircraft were approaching Kelly at the same altitudes before

and after 1980. Third, the limited evidence of the frequency of flights suggested that the number of operations was higher in 1980 than at any time thereafter.

In addition, there was no evidence that the overflights affected the highest and best use of the parcels. 4M Properties purchased parcel J with the intent of subdividing it for light industrial use; Terry Britton and Somerset Joint Venture purchased parcel K for the same purpose. In connection with the sale, zoning was changed from B residential to I–1 light industrial, and 4M signed a memorandum of understanding limiting the use of the property. At the time of purchase, the highest and best use of parcels J and K was for light industrial. Plaintiffs did not prove that aircraft that began flying over these properties after 1984 substantially interfered with the enjoyment and use of parcels J and K for industrial purposes. Although there was speculation that Sea World declined to purchase nearby land because of high noise levels, Sea World in no way can be considered a "light industrial" enterprise. The court notes that the high noise levels on parcels J and K (in excess of 70 DNL) predated 4M and Terry Britton's ownership.

Although 4M and Mr. Britton's expectations of developing J and K were apparently not fulfilled, plaintiffs did not establish that this was due to low level overflights. The evidence at trial indicated that at the time of purchase the mayor of San Antonio was trying to stimulate development in the south part of the city because it was growing at a slower rate than the rest of San Antonio. After 1984 there were major changes to the federal tax code. These changes impacted the national as well as the local real estate market. Further, the savings and loan industry entered several disastrous years after Terry Britton and 4M purchased J and K, and credit was nonexistent. Although Mr. Britton acknowledged that the real estate market was "dead" in the entire city of San Antonio from 1986 [15] to 1990, he maintained, incredibly, that these factors did not contribute to any decline in value for the subject parcels. Rather, he maintained that the al-

---

15. At trial plaintiffs took the position that the alleged taking claim accrued on May 1, 1986.

legedly flat market in the APZ zones during the same period was caused by overflights. The court notes that even if Mr. Britton's credibility had not previously been diminished by some of his testimony on cross-examination, his unwillingness to credit the possibility that the subject parcels could be affected by the same factors as the rest of the country rendered his testimony on this issue unbelievable.

#### 4. *Parcels N and O*

Parcel N is currently owned by Mr. Raymond Wauters. It is part of a 24.17 acre parcel located southeast of KAFB; 14.794 acres are located in APZ2. Raymond and Lorraine Wauters also own parcel O which is a half acre tract located in APZ2 southeast of KAFB. There was no testimony at trial of flights directly over parcels N or O. If the court assumes that flights necessarily are over these parcels because they are located in APZ2, it still must conclude that plaintiffs failed to prove that the United States took an avigation easement.

First, for the reasons detailed above, the court finds that there was no credible evidence that aircraft landing over parcels N and O did so below navigable airspace, and no evidence at all that aircraft taking off over parcels N and O flew below navigable airspace. Because parcels N and O are located south of Kelly, at least seventy percent of these flights over these properties were takeoffs. Second, the limited evidence available indicates that the number of flights over parcels N and O was sufficient to activate the takings clause by 1981, and decreased thereafter. Third, there was no evidence from which the court could determine how parcels N and O are used or have been used in the past. Although Mr. Raymond Wauters testified that he believed the value of parcels N and O had decreased because of "crash danger, noise and adverse publicity or newspaper publicity," none of these factors which allegedly decreased the value of parcels N or O were linked to frequent low level flights. To the extent that plaintiffs suggest that the Air Force is liable for a taking if it informed the public about noise levels and accident potential in the APZ zones, this claim is without merit. The Air Force "can be said

to be vigilant, aggressive, and perhaps more, but it cannot be said that supplying information on an assertedly hazardous situation constitutes a 'taking' of property within the fifth amendment." *Bodine,* 210 Ct.Cl. at 689 (similar takings case against the Navy for low level flights).

Even if plaintiffs had established a link between noise levels on the subject properties and low level overflights, it is clear that by 1981 parcels N and O were unsuitable for residential use. Noise levels on parcel N were in excess of 70 DNL in 1980, and noise levels on parcel O were greater than 75 DNL. Therefore, if plaintiffs had established a link between the other elements of a takings claim and the noise levels, any claim based on interference with residential use of parcels N and O would have accrued no later than 1981.

#### 5. *Parcel S*

Parcel S is a 1.187 acre tract located southeast of KAFB in APZ2 and is currently owned by Roger and Patricia Verstuyft. Based on the testimony of Mrs. Verstuyft and the location of the parcel, the court is satisfied that flights from Kelly are directly over this property. Because parcel S is located south of Kelly, approximately seventy percent of these flights would have occurred on takeoff.

Although there was evidence of flights directly over parcel S, there was no credible evidence of the height or frequency of aircraft flying over parcel S. Further, the limited evidence available indicates that since 1980, the height of aircraft on approach has not decreased, and the number of aircraft has not increased. Therefore, the court concludes that plaintiffs failed to prove a taking after July 15, 1982. Further, although Patricia Verstuyft testified that tract S was "not suitable for human habitation" because of overflights by the C–5A, it is clear that by 1981 at the latest that condition attached to the land, and tract S did not have a highest and best use as residential property.

#### 6. *Parcel U*

Parcel U is part of a 24.283 acre tract located southeast of KAFB; 20.317 acres are located in APZ2. Parcel U is owned jointly

by Irma Verstuyft, Roger Verstuyft, Marvin G. Verstuyft and Sharon E. Eisenhauer. There was no evidence of flights directly over this parcel and below navigable airspace. Further, the limited evidence of operations contradicts plaintiffs' claim that the number of operations increased after 1982, and there was no evidence on the use of parcel U before or after July 1982. To the extent Mrs. Verstuyft intended to refer to tract U as well as tract S, when she stated that her land was not suitable for human habitation, the court notes that noise levels on parcel U ranged from 70–80 DNL in 1980, and most of the land had sound levels greater than 75 DNL. Therefore, by 1981 the highest and best use of parcel U was something other than residential.

### 7. *Parcel V*

Parcel V is part of a 26.147 acre tract located southeast of KAFB of which 19.373 acres are on the edge of APZ1 and APZ2. Parcel V is currently owned by Mildred V. Baecke and Alene Buys. Mildred Baecke testified that while she lived on parcel V during the 1960s, aircraft flew "over" the property, but she did not "pay any attention" to them because she was young. Mrs. Baecke also testified, however, that she lived on tract B from 1952 until 1994. The court does not suggest or conclude that the contradictions were caused by a deliberate effort to mislead the court; rather, the court attributes the contradictions to plaintiffs' counsel's spurious, leading, and confusing questions. Nevertheless, the court was unable to accord weight to her testimony of flights directly over parcel V because of these contradictions in her testimony and admitted gaps in her perception of events.

Even if the court credited Mrs. Baecke's testimony about flights over parcel V, however, it still must conclude that plaintiffs did not prove a taking of the airspace because the only evidence of the altitude of the aircraft and the frequency of flights suggests that any claim would have accrued no later than 1981. Further, although there was evidence that parcel V was used for residential purposes until at least 1952, there was no

evidence of its use after that date. To the extent plaintiffs allege parcel V lacked value for residential purposes after July 1982, the court notes that in 1980 noise levels on parcel V ranged from 70–80 DNL; most of the land had sound levels greater than 75 DNL, rendering the land not compatible with residential use.

### 8. *Parcel Y*

Parcel Y is a one acre water retention pond. As with many of the subject parcels, noise levels on this property are very high; in 1980 they ranged from 75–80 DNL. Although these levels would be incompatible with residential use, the court does not perceive any interference with the use and enjoyment of this property as a pond. Therefore, on the facts of this case there could be no taking of an avigation easement over parcel Y even if there were low and frequent flights directly over this land.

### 9. *Parcel BB*

Parcel BB is a 4.358 acre tract located southeast of KAFB in APZ1. A.C. Lopez obtained title to parcel BB by warranty deed dated June 7, 1984. Although there was no direct testimony regarding flights over parcel BB, the close proximity of parcel BB to parcel A, coupled with testimony of flights over an adjoining lot was sufficient to support a finding of flights directly over parcel BB.[16] Nevertheless, because the court was unable to credit Mr. Lopez's testimony regarding the height of aircraft passing over parcel BB, *see supra*, and because in any event plaintiffs failed to establish that low frequent flights began after June 7, 1984, Mr. Lopez's claim for the taking of an avigation easement must fail.

Even if these elements were established, plaintiffs failed to prove that overflights after 1984 substantially interfered with the use and enjoyment of parcel BB. Although Mr. Lopez testified that he was unable to develop or sell the property, it was clear from his testimony that he attributed the cause to a zoning change that went into effect on May 1, 1986, rather than overflights from aircraft. In addition, by the time Mr.

**16.** Although the court is satisfied with the proof on this particular element, the witness who testi- fied regarding parcel BB was far from being completely credible on all issues.

Lopez purchased tract BB in 1984, the property was already subject to noise levels in excess of 75 DNL, rendering it incompatible with residential use. The court also notes that at the time Mr. Lopez obtained titled, parcel BB was subject to a flight easement recorded in Volume 4061, page 501 Deed Records of Bexar County, Texas. There was no evidence of the extent of this easement.

### 10. *Parcel HH*

Parcel HH is part of a 48.123 acre parcel located northwest of KAFB; 43.352 acres are located in APZ2 north. Plaintiff Terry Britton purchased parcel HH on or about 1980 and sold it in 1984 to Robert Cadena, John Miller and the Comcal Group.

At the time Mr. Miller purchased tract HH, approximately twenty percent of the operations from Kelly used runway 14/32. Because tract HH is located to the northwest of Kelly, aircraft using runway 14/32 did not fly directly over parcel HH. In 1985 or 1986 runway 14/32 closed. At that time traffic previously routed over runway 14/32 began flying from runway 15/33 and, therefore, over parcel HH. Nevertheless, to the extent the court is able to rely on the limited data provided by plaintiffs, it is clear that the number of flights over parcel HH was greater in 1980 than at any time thereafter. In 1980 there were at least 115,528.40 operations from Kelly. Eighty percent or 92,-422.20 used runway 15/33. Half of that number, therefore, would have been over parcels to the north, and half would have been over parcels to the south. Therefore, there were approximately 46,211.36 flights over parcel HH in 1980, and in 1983 there were 27,034 such operations (half of eighty percent of total operations). After 1986 there was only one runway at Kelly. Even if there were 89,588 operations at Kelly in the years after 1986, only half of those, or 44,794, would have overflown parcel HH. Therefore, based on the limited evidence provided, the court can only conclude that more aircraft flew over parcel HH in 1980 than at any time thereafter. The court notes that Mr. Miller testified that there were over 200,000 operations in 1967. Although the court has not assigned any weight to this unsubstantiated testimony,

it would support the court's finding that the number of operations decreased after 1980.

In addition, as the court has previously noted, there is no evidence that aircraft began flying at lower altitudes after 1980. The court finds that there is no evidence that aircraft from Kelly began to substantially interfere with the use and enjoyment of parcel HH after 1984. At the time of purchase tract HH was zoned light industrial. In March 1985 the Mexican American Unity Council, Inc. obtained an option to purchase tract HH. The option expired if not executed by October 31, 1985. Under the terms of the option, the buyer had the right to cancel the option at any time during its term in the event the property did "not prove satisfactory for Buyer's intended use, in Buyer's sole discretion and opinion." Prior to October 31, 1985, the Mexican American Unity Council, Inc. elected not to exercise its option to purchase tract HH, allegedly because the project would have required extensive noise abatement treatment. The court notes that noise levels for parcel HH were in excess of 70–80 DNL in 1980. Therefore, even if this limited evidence was sufficient to establish that high noise levels from low flying aircraft interfered with the use and enjoyment of parcel HH, it would appear that such a claim is outside the statute of limitations. Further, Mr. Miller and Mr. Cadena do not have standing to maintain takings claims arising before they owned the subject property.

### 11. *The Remaining Parcels*

With respect to parcels C, D, E, F, G, H, I, L, M, P, Q, R, T, W, X, Z, AA, CC, DD, FF, GG and II, there was no evidence regarding flights directly over these parcels, or the altitude or number of such flights. Further, there was no evidence of the use of the parcels before or after July 1982. *Compare Robertson v. United States,* 173 Ct.Cl. 621, 624, 352 F.2d 539, 540–41 (1965) (land used for grazing cattle and producing oil). The court notes, however, that, in 1980, noise levels for parcels C, D, E, F, G, H, I, L, M, P, Q, R, T, GG and II were in excess of 70 DNL; noise levels for parcels W, X, Z, AA, CC and FF were in excess of 75 DNL; noise levels for parcel DD exceeded 80 DNL. Therefore, by 1981 none of the above parcels

had a highest and best use as residential properties.

### D. *Plaintiffs Do Not Have a Claim for an Additional Taking*

■ Although plaintiffs failed to establish that aircraft flew directly over the subject parcels, or the altitude or number of such aircraft, and interference with the use and enjoyment of those parcels, prior to trial it appeared possible that plaintiffs might have a colorable claim based on flights by the C–5A aircraft. In pretrial filings, plaintiffs alleged that the C–5A was an immense, noisy aircraft that began flying sometime after 1984 or 1985, and made an already bad situation worse. If plaintiffs had established the basic elements of a taking, they might have recovered for an additional takings based on flights of the C–5A if they had also shown that after July 15, 1982:

> [T]he nature and degree of the disturbance to private property rights in approach zones below the line of flight [was] substantially worsened and rendered intolerable by the use of aircraft which, because of their size, power, noise, altitude and flight characteristics, or because of structural changes in the airport layout, impose[d] a greater degree of interference in the enjoyment of property over which they pass en route to or from their operating runways than the conditions which previously inhered. . . .

*Boardman,* 180 Ct.Cl. at 271, 376 F.2d at 899. In the case of a taking of an additional easement, "a significant depreciation in the market value of the property as a direct result of the overflights is not only a prerequisite to recovery of just compensation but also marks the date of taking from which applicable statutes of limitation commence to run and valuations for damage purposes are to be measured." *Id.* at 271, 376 F.2d at 899; *see also Avery,* 165 Ct.Cl. at 361, 330 F.2d at 643.

Unfortunately, as with virtually every aspect of plaintiffs' case, any claim for an additional taking based on the C–5A was frustrated by a total lack of credible evidence. First, although plaintiffs alleged that the C–5A was introduced after July 15, 1982, there

was no evidence, credible or otherwise, of the actual number of flights by the C–5A. The 1984 EA projected that sixteen C–5As would be delivered to the 433d MAW, but this was merely a projection; it is not evidence of what actually occurred. Further, according to the 1986 EA, only five C–5As arrived. Although the 1986 EA estimated that when the sixteen C–5As arrived they would conduct twenty-one operations per day, there was no evidence that more than five C–5As were ever delivered to the 433d MAW, or of the number of operations performed by those five C–5As. In the absence of evidence, the court attaches no weight to the unsupported allegations of a few plaintiffs that flights by the C–5A increased after 1985. Although not dispositive on the facts of this case, the court notes that the twenty-one predicted operations by the C–5A would have amounted to only six percent of total operations.

Further, the court notes that there were C–5As at Kelly before 1982. The United States Air Force received its first C–5A in December 1968. JANE'S ALL THE WORLD'S AIRCRAFT 378 (John W.R. Taylor ed. 1975–76). As early as 1973 there was at least one C–5A stationed at Kelly, and by 1973 the SAALC was the logistic support manager for the Military Aircraft Command's C–5A Galaxy jet transport fleet. The C–5As were flight tested in conjunction with depot maintenance at KAFB. By May 1973 the Air Force had received eighty-one C–5As. *Id.*

In addition, although the C–5A is indeed a huge aircraft, there was no evidence that the C–5A is substantially noisier than other aircraft flying in the skies above plaintiffs' properties. The court finds it significant that the Air Force made a finding of No Significant Impact with respect to the proposal to add sixteen C–5As to Kelly's aircraft fleet. In addition, the 1986 EA actually reported a slight decrease over 1980 noise levels. Further, there was no evidence to support a finding that there was a greater risk of accidents from the C–5A than from other aircraft.

■ Finally, there was no credible evidence of a significant drop in market value attributable to flights of the C–5A. As the

court has previously noted, plaintiffs' sole expert on fair market value was thoroughly discredited on cross-examination. Further, during the same period that the C–5A allegedly began to fly, the market for real estate in the entire City of San Antonio was adversely affected by major changes in the federal tax code and devastation in the savings and loan industry which had the effect of eliminating credit. There was also a zoning change that affected at least some of the subject parcels. At least one witness testified that he was unable to use or sell his property after the zoning change. Therefore, even if plaintiffs had proven that aircraft flying over the subject parcels regularly intruded into protected airspace, there can be no finding of an additional taking in the absence of evidence that the C–5A began flying frequently after July 15, 1982, substantially increased the burden on the subject parcels and resulted in a significant drop in market value.

## CONCLUSION

For the foregoing reasons, the court finds that plaintiffs failed to prove that the United States took avigation easements over the subject properties after July 15, 1982. Defendant's motion to dismiss all claims in the above entitled case is granted, and the complaint is dismissed with prejudice. Pursuant to RCFC 52(c), the court's findings of fact and conclusions of law are listed in the attached appendix.

**IT IS SO ORDERED.**

### APPENDIX

### FINDINGS OF FACT

1. Kelly Air Force Base (KAFB) is located in Bexar County, Texas; it is approximately 7 miles from the geographic center of San Antonio.

2. KAFB is surrounded on three sides by the City of San Antonio; on the west side it is bounded by Lackland Air Force Base.

3. Camp Kelly was established in May 1917; it was renamed Kelly Field in July 1917.

### APPENDIX—Continued

4. In December 1917, Kelly was divided into two fields.

5. Pilot training, supply functions and warehouses were located at field No. 1; field No. 2 was used for flight instructor training.

6. In 1925, the Aviation Repair Depot was moved to Kelly No. 1, and the field was renamed Duncan field.

7. From 1925, Kelly Field and Duncan Field functioned separately.

8. In March 1943, the flight school was moved to Randolph Field, and Kelly and Duncan Fields were joined as Kelly Field.

9. In January 1948, Kelly Field was renamed Kelly Air Force Base.

10. The 2851st Air Base Group is the host organization at KAFB; its tenants include a number of organizations including the San Antonio Air Logistics Center (SAALC), the 149th Tactical Fighter Group and the 433d Tactical Airlift Wing.

11. During the 1970s, the United States Air Force adopted the Department of Defense Air Installation Compatible Use Zone program designating lands at the end of active runways as being in clear zones or accident potential zones (APZs).

12. The clear zone is a 3000' by 3000' area adjacent to the center line of the runway.

13. APZ1s are located immediately adjacent to the clear zone. They are the same width as the clear zone, but are 5000' in length.

14. APZ2s are 3000' wide beginning at a distance of 8000' from the end of the runway and extending to a distance of 15,000' from the end of the runway.

15. All of the subject parcels are located, at least in part, in the Accident Potential Zones for runway 15/33.

16. The south APZs for runway 14/32 overlap the south APZs for runway 15/33.

17. From November 1972 through October 1973, there were at least fifty-two sorties per day from Kelly. Aircraft sta-

tioned at Kelly accounted for forty-five percent of the sorties; the remaining sorties were performed by transient aircraft.

18. The fleet of aircraft stationed at Kelly in October 1973 included the F–100, T–39, C–130, B–52, C–5A, F–106, T–30 and the F–5.

19. On or before 1975, the SAALC became the logistic support manager for the Military Aircraft Command's C–5A Galaxy jet transport fleet. The KAFB mission includes flight testing in conjunction with depot maintenance of the C–5As.

20. In 1979, the 149th Tactical Fighter Group converted from the F–100 aircraft to the F–4C aircraft.

21. From 1980 through 1986, the F–4C flew approximately ninety operations per day.

22. By 1981, noise levels for land surrounding KAFB were 175 percent greater than 1975 levels; this increase was attributable to the introduction of the F–4C in 1979.

23. In 1980, there were at least 444.34 operations per day or, assuming a five day week, 115,528.40 operations per year.

24. In 1983, there were at least 67,585 operations per year from Kelly.

25. Most aircraft operations at KAFB occur between the hours of 7:00 am and 10:00 pm.

26. Because of prevailing winds, approximately 70–80 percent of the flights taking off and landing at KAFB occurred in a north to south direction.

27. From 1955 to 1986, there were two active runways at Kelly.

28. By 1980, runway 15/33 was used for approximately 80 percent of the operations at Kelly; runway 14/32 was used for approximately 20 percent of the operations.

29. KAFB is located in a non-congested area of San Antonio.

30. The parties stipulated to ownership of parcels A, B, C, D, E, F, G, H, I, J, K,

L, M, N, O, P, Q, R, S, T, U, V, W, X, BB, DD, FF, GG, HH and II.

31. Parcel A is a 23.59 acre parcel to the southeast of KAFB; it is located in APZ1 and APZ2 for runway 15/33.

32. Parcel A is owned by Clotilde Persyn, individually and as the independent executrix of the estate of Darson H. Persyn, who died on December 10, 1994.

33. Flights taking off from runway 15/33 fly over parcel A approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel A approximately 30 percent of the time.

34. Plaintiff Clotilde Persyn and her husband Darson Persyn (now deceased) moved onto parcel A on May 1, 1935 and continued to live on the property thereafter.

35. Parcel A is intersected by the Laredo Highway. There is a house and barn on the south side of the Laredo highway; the Persyns used the land for farming until Darson Persyn became sick.

36. After Mr. Persyn became sick, the Persyns rented the land to an unidentified person who uses the land for irrigation and farming.

37. In 1980, noise levels on parcel A ranged from 75–80 DNL.

38. By 1981, parcel A did not have a highest and best use as residential property.

39. High noise levels did not substantially interfere with the agricultural use of parcel A.

40. Noise levels over parcel A did not substantially increase after July 15, 1982.

41. The number of actual flights by jet aircraft over parcel A in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

42. Parcel B is part of a 19.433 acre tract located southeast of KAFB; 3.185 acres are located in the southwesternmost corner of APZ2.

43. Flights taking off from runway 15/33 fly over parcel B approximately 70 percent of the time; flights landing on

APPENDIX—Continued

runway 15/33 fly over parcel B approximately 30 percent of the time.

44. Plaintiffs Florent and Mildred V. Baecke moved onto the parcel that included parcel B in 1952; in 1952 they owned the house and the acreage upon which it rested (approximately ½ acre), and Mr. Baecke's parents owned the remainder of parcel B.

45. In 1971, the Federal Housing Administration refused to finance the sale of parcel B because of high noise levels.

46. In 1980, noise levels on parcel B ranged from 70–75 DNL.

47. By 1981, parcel B did not have a highest and best use as residential property.

48. Noise levels over parcel B did not substantially increase after July 15, 1982.

49. The number of actual flights by jet aircraft over parcel B in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

50. In 1985, Mr. Baecke inherited parcel B from his parents.

51. Parcel C is part of a 39.261 acre tract located southeast of KAFB; 25.415 acres of the tract are located in APZ2.

52. Flights taking off from runway 15/33 fly over parcel C approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel C approximately 30 percent of the time.

53. Parcel C is currently owned by plaintiffs Paul and Erma Persyn.

54. In 1980, noise levels on parcel C ranged from 70–75 DNL.

55. By 1981, parcel C did not have a highest and best use as residential property.

56. Noise levels over parcel C did not substantially increase after July 15, 1982.

57. The number of actual flights by jet aircraft over parcel C in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

58. Parcel D is part of a 46.904 acre parcel to the southeast of KAFB; 43.308 acres are located in APZ2.

APPENDIX—Continued

59. Flights taking off from runway 15/33 fly over parcel D approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel D approximately 30 percent of the time.

60. Parcel D is currently owned by plaintiff Raul Jimenez, Sr.

61. In 1980, noise levels on parcel D ranged from 70–75 DNL.

62. By 1981, parcel D did not have a highest and best use as residential property.

63. Noise levels over parcel D did not substantially increase after July 15, 1982.

64. The number of actual flights by jet aircraft over parcel D in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

65. Parcel E is a 1.507 acre parcel to the southeast of KAFB; it is located in APZ2.

66. Flights taking off from runway 15/33 fly over parcel E approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel E approximately 30 percent of the time.

67. Parcel E is currently owned by plaintiffs Aviel and Josie A. Broekhove.

68. In 1980, noise levels on parcel E ranged from 70–75 DNL.

69. By 1981, parcel E did not have a highest and best use as residential property.

70. Noise levels over parcel E did not substantially increase after July 15, 1982.

71. The number of actual flights by jet aircraft over parcel E in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

72. Parcel F is part of a 19.497 acre tract located southeast of KAFB; 11.465 acres are located in APZ2.

73. Flights taking off from runway 15/33 fly over parcel F approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel F approximately 30 percent of the time.

74. Parcel F is currently owned by Richard Persyn and Celeste Worrick.

APPENDIX—Continued

APPENDIX—Continued

75. In 1980, noise levels on parcel F ranged from 70–80 DNL.

76. By 1981, parcel F did not have a highest and best use as residential property.

77. Noise levels over parcel F did not substantially increase after July 15, 1982.

78. The number of actual flights by jet aircraft over parcel F in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

79. Parcel G is a 6.814 acre parcel to the southeast of KAFB; it is located in APZ2.

80. Flights taking off from runway 15/33 fly over parcel G approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel G approximately 30 percent of the time.

81. Gabriel Thienpont, Emma Persyn, Mary Rosenbush and Margaret Milam jointly owned Parcel G until December 28, 1992.

82. On February 1, 1994, the court allowed plaintiffs' motion to substitute Frank Persyn, Henry Joe Persyn, Leslie Ann Persyn, Lorraine Steubing and Laura Persyn as successors to Emma Persyn, Dec'd.

83. In 1980, noise levels on parcel G ranged from 70–80 DNL.

84. By 1981, parcel G did not have a highest and best use as residential property.

85. Noise levels over parcel G did not substantially increase after July 15, 1982.

86. The number of actual flights by jet aircraft over parcel G in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

87. Parcel H is a 1.322 acre parcel to the southeast of KAFB; it is located in APZ2.

88. Flights taking off from runway 15/33 fly over parcel H approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel H approximately 30 percent of the time.

89. Parcel H is currently owned by Hortense Broekhove.

90. In 1980, noise levels on parcel H ranged from 75–80 DNL.

91. By 1981, parcel H did not have a highest and best use as residential property.

92. Noise levels over parcel H did not substantially increase after July 15, 1982.

93. The number of actual flights by jet aircraft over parcel H in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

94. Parcel I is a 1.184 acre parcel to the southeast of KAFB; it is located in APZ2 adjacent to parcel E.

95. Flights taking off from runway 15/33 fly over parcel I approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel I approximately 30 percent of the time.

96. Parcel I is currently owned by Hortense Broekhove.

97. In 1980, noise levels on parcel I ranged from 70–75 DNL.

98. By 1981, parcel I did not have a highest and best use as residential property.

99. Noise levels over parcel I did not substantially increase after July 15, 1982.

100. The number of actual flights by jet aircraft over parcel I in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

101. Parcel J is a 15.874 acre parcel located to the southeast of KAFB; it is located in APZ2.

102. Flights taking off from runway 15/33 fly over parcel J approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel J approximately 30 percent of the time.

103. In 1980, noise levels on parcel J ranged from 70–80 DNL.

104. Noise levels over parcel J did not substantially increase after July 15, 1982.

105. The number of actual flights by jet aircraft over parcel J in 1980 was

greater than the actual flights in 1983 or the projected flights after 1986.

106. Parcel J was purchased by 4M Properties for approximately $396,000 in October 1984.

107. At the time of purchase, 4M Properties was aware that aircraft taking off and landing at KAFB would fly over parcel J.

108. At the time of purchase, the highest and best use for property J was for light industrial/commercial enterprise.

109. Overflights of aircraft from KAFB did not substantially interfere with the highest and best use of parcel J after 1984.

110. Parcel K is part of a 8.79 acre parcel located to the southeast of KAFB; 8.099 acres are located in APZ2 adjacent to parcel J.

111. Flights taking off from runway 15/33 fly over parcel K approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel K approximately 30 percent of the time.

112. Parcel K was purchased by Terry Britton in partnership with Somerset Joint Venture for approximately $196,000 in February 1985.

113. At the time of purchase, Somerset Joint Venture was aware that aircraft taking off and landing at KAFB would fly over parcel K.

114. At the time of purchase, the highest and best use for property K was for light industrial/commercial enterprise.

115. Overflights of aircraft from KAFB did not substantially interfere with the highest and best use of parcel K after 1984.

116. In 1980, noise levels on parcel K ranged from 70–80 DNL.

117. Noise levels over parcel K did not substantially increase after July 15, 1982.

118. The number of actual flights by jet aircraft over parcel K in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

119. Parcel L is part of a 24.565 acre parcel to the southeast of KAFB; 11.781 acres are located in APZ2.

120. Flights taking off from runway 15/33 fly over parcel L approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel L approximately 30 percent of the time.

121. Parcel L is jointly owned by Aviel L. Broekhove, Phil M. Broekhove and Emiel P. Broekhove.

122. In 1980, noise levels on parcel L ranged from 70–80 DNL.

123. By 1981, parcel L did not have a highest and best use as residential property.

124. Noise levels over parcel L did not substantially increase after July 15, 1982.

125. The number of actual flights by jet aircraft over parcel L in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

126. Parcel M is part of a 24.67 acre parcel located southeast of KAFB; 13.757 acres are located in APZ2.

127. Flights taking off from runway · 15/33 fly over parcel M approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel M approximately 30 percent of the time.

128. Parcel M was jointly owned by Remi Aelvoet, Marshall Aelvoet, Richard Aelvoet, Erma Persyn and Elsie Aelvoet Verelst until February 1, 1992.

129. Remi Aelvoet died on February 1, 1992.

130. On February 1, 1994, the court allowed plaintiffs' motion to substitute Marie Aelvoet as the devisee of Remi Aelvoet.

131. In 1980, noise levels on parcel M ranged from 70–80 DNL.

132. By 1981, parcel M did not have a highest and best use as residential property.

133. Noise levels over parcel M did not substantially increase after July 15, 1982.

134. The number of actual flights by jet aircraft over parcel M in 1980 was

greater than the actual flights in 1983 or the projected flights after 1986.

135. Parcel N is part of a 24.17 acre parcel located southeast of KAFB; 14.794 acres are located in APZ2.

136. Flights taking off from runway 15/33 fly over parcel N approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel N approximately 30 percent of the time.

137. Raymond Wauters inherited Parcel N upon the death of his mother on February 21, 1992.

138. In 1980, noise levels on parcel N ranged from 70–80 DNL.

139. By 1981, parcel N did not have a highest and best use as residential property.

140. Noise levels over parcel N did not substantially increase after July 15, 1982.

141. The number of actual flights by jet aircraft over parcel N in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

142. Parcel O is .500 acres southeast of KAFB; it is located in APZ2.

143. Flights taking off from runway 15/33 fly over parcel O approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel O approximately 30 percent of the time.

144. Parcel O is owned by Raymond and Lorraine Wauters.

145. In 1980, noise levels on parcel O ranged from 75–80 DNL.

146. By 1981, parcel O did not have a highest and best use as residential property.

147. Noise levels over parcel O did not substantially increase after July 15, 1982.

148. The number of actual flights by jet aircraft over parcel O in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

149. Parcel P is part of a 32.85 acre tract located southeast of KAFB; 23.010 acres are located in APZ2.

150. Flights taking off from runway 15/33 fly over parcel P approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel P approximately 30 percent of the time.

151. Parcel P is owned by Irma Verstuyft.

152. In 1980, noise levels on parcel P ranged from 70–80 DNL; most of the land had sound levels greater than 75 DNL.

153. By 1981, parcel P did not have a highest and best use as residential property.

154. Noise levels over parcel P did not substantially increase after July 15, 1982.

155. The number of actual flights by jet aircraft over parcel P in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

156. Parcel Q is part of a 50.503 acre tract located southeast of KAFB; 26.908 acres are located in APZ2.

157. Flights taking off from runway 15/33 fly over parcel Q approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel Q approximately 30 percent of the time.

158. Parcel Q was jointly owned by Raymond Verstuyft and Robert and Eunice Verstuyft until September 10, 1989.

159. Raymond Verstuyft died on September 10, 1989.

160. Robert Verstuyft died on May 28, 1990.

161. On February 1, 1994, the court allowed plaintiffs motion to substitute Eunice Verstuyft for the interest of Robert Verstuyft, Dec'd, and Michael Raymond Verstuyft, Gary E. Verstuyft, David A. Verstuyft, Richard J. Verstuyft, Julia L. Verstuyft and Shirley P. Verstuyft for the interest of Raymond Verstuyft, Dec'd.

162. In 1980, noise levels on parcel Q ranged from 70–80 DNL; most of the land had sound levels greater than 75 DNL.

163. By 1981, parcel Q did not have a highest and best use as residential property.

164. Noise levels over parcel Q did not substantially increase after July 15, 1982.

165. The number of actual flights by jet aircraft over parcel Q in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

166. Parcel R is part of a 25.47 acre tract located southeast of KAFB; 18.600 acres are located in APZ2.

167. Flights taking off from runway 15/33 fly over parcel R approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel R approximately 30 percent of the time.

168. Parcel R is owned by Margaret Verstuyft, Edward C. Verstuyft, John D. Verstuyft and Marie Durst.

169. In 1980, noise levels on parcel R ranged from 70–80 DNL; most of the land had sound levels greater than 75 DNL.

170. By 1981, parcel R did not have a highest and best use as residential property.

171. Noise levels over parcel R did not substantially increase after July 15, 1982.

172. The number of actual flights by jet aircraft over parcel R in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

173. Parcel S is a 1.187 acre tract located southeast of KAFB in APZ2; it is currently owned by Roger and Patricia Verstuyft.

174. Flights taking off from runway 15/33 fly over parcel S approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel S approximately 30 percent of the time.

175. Flights taking off from runway 15/33 fly over parcel S approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel S approximately 30 percent of the time.

176. In 1980, noise levels on parcel S ranged from 75–80 DNL.

177. By 1981, parcel S did not have a highest and best use as residential property.

178. Noise levels over parcel S did not substantially increase after July 15, 1982.

179. The number of actual flights by jet aircraft over parcel S in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

180. Parcel T is a 18.720 acre tract located southeast of KAFB in APZ2.

181. Flights taking off from runway 15/33 fly over parcel T approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel T approximately 30 percent of the time.

182. Parcel T was owned by Irma Verstuyft and George Verstuyft until September 26, 1990.

183. George Verstuyft died on September 26, 1990.

184. On February 1, 1994, the court allowed plaintiffs' motion to substitute Roger Verstuyft, Marvin G. Verstuyft and Sharon E. Eisenhauer for the interest of George Verstuyft in parcel T.

185. In 1980, noise levels on parcel T ranged from 70–80 DNL; most of the land had sound levels greater than 75 DNL.

186. By 1981, parcel T did not have a highest and best use as residential property.

187. Noise levels over parcel T did not substantially increase after July 15, 1982.

188. The number of actual flights by jet aircraft over parcel T in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

189. Parcel U is part of a 24.283 acre tract located southeast of KAFB; 20.317 acres are located in APZ2.

190. Flights taking off from runway 15/33 fly over parcel U approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel U approximately 30 percent of the time.

191. Parcel U was owned by Irma Verstuyft and George Verstuyft until September 26, 1990.

192. On February 1, 1994, the court allowed plaintiffs' motion to substitute Roger Verstuyft, Marvin G. Verstuyft and

APPENDIX—Continued

Sharon E. Eisenhauer for the interest of George Verstuyft in parcel U.

193. In 1980, noise levels on parcel U ranged from 70–80 DNL; most of the land had sound levels greater than 75 DNL.

194. By 1981, parcel U did not have a highest and best use as residential property.

195. Noise levels over parcel U did not substantially increase after July 15, 1982.

196. The number of actual flights by jet aircraft over parcel U in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

197. Parcel V part of a 26.147 acre tract located southeast of KAFB; 19.373 acres are in APZ1 and APZ2.

198. Flights taking off from runway 15/33 fly over parcel V approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel V approximately 30 percent of the time.

199. Parcel V was owned by Clara Verschelden, Mildred V. Baecke and Alene Buys until April 15, 1992.

200. Clara Verschelden died on April 15, 1992.

201. The current owners of parcel V are Mildred V. Baecke and Alene Buys.

202. Mildred Baecke lived on parcel V until 1952.

203. In 1980, noise levels on parcel V ranged from 70–80 DNL; most of the land had sound levels greater than 75 DNL.

204. By 1981, parcel V did not have a highest and best use as residential property.

205. Noise levels over parcel V did not substantially increase after July 15, 1982.

206. The number of actual flights by jet aircraft over parcel V in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

207. Parcel W is a 24.89 acre parcel located southeast of KAFB in APZ1 and

APPENDIX—Continued

APZ2; it is owned by Clara Verstuyft Persyn.

208. Flights taking off from runway 15/33 fly over parcel W approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel W approximately 30 percent of the time.

209. In 1980, noise levels on parcel W ranged from 75–80 DNL.

210. By 1981, parcel W did not have a highest and best use as residential property.

211. Noise levels over parcel W did not substantially increase after July 15, 1982.

212. The number of actual flights by jet aircraft over parcel W in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

213. Parcel X is a 21.368 parcel located southeast of KAFB in APZ1 and APZ2; it is owned by Irma Verstuyft.

214. Flights taking off from runway 15/33 fly over parcel X approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel X approximately 30 percent of the time.

215. In 1980, noise levels on parcel X ranged from 75–80 DNL.

216. By 1981, parcel X did not have a highest and best use as residential property.

217. Noise levels over parcel X did not substantially increase after July 15, 1982.

218. The number of actual flights by jet aircraft over parcel X in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

219. Parcel Y is a 1.00 acre parcel located southeast of KAFB in APZ1; at trial plaintiffs did not establish ownership of this parcel or standing to sue.

220. Flights taking off from runway 15/33 fly over parcel Y approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel Y approximately 30 percent of the time.

221. Parcel Y has been used as a water hole for parcels A, X, W and Z at all times relevant to this litigation.

222. In 1980, noise levels on parcel Y ranged from 75–80 DNL.

223. By 1981, parcel Y did not have a highest and best use as residential property.

224. Overflights from KAFB have not substantially interfered with the use of parcel Y as a water hole.

225. Noise levels over parcel Y did not substantially increase after July 15, 1982.

226. The number of actual flights by jet aircraft over parcel Y in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

227. Parcel Z consists of 22.064 acres, intersected by the Laredo Highway, southeast of KAFB in APZ1 and APZ2.

228. Parcel Z is owned by Henry Verstuyft and Juliana Verstuyft.

229. Flights taking off from runway 15/33 fly over parcel Z approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel Z approximately 30 percent of the time.

230. In 1980, noise levels on parcel Z ranged from 75–80 DNL.

231. By 1981, parcel Z did not have a highest and best use as residential property.

232. Noise levels over parcel Z did not substantially increase after July 15, 1982.

233. The number of actual flights by jet aircraft over parcel Z in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

234. Parcel AA consists of 23.059 acres located southeast of KAFB in APZ1 and APZ2; the parties did not stipulate to ownership of this parcel and there was no evidence on this issue at trial.

235. Flights taking off from runway 15/33 fly over parcel AA approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel AA approximately 30 percent of the time.

236. In 1980, noise levels on parcel AA ranged from 75–80 DNL.

237. By 1981, parcel AA did not have a highest and best use as residential property.

238. Noise levels over parcel AA did not substantially increase after July 15, 1982.

239. The number of actual flights by jet aircraft over parcel AA in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

240. Parcel BB is a 4.358 acre tract located southeast of KAFB in APZ1.

241. Flights taking off from runway 15/33 fly over parcel BB approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel BB approximately 30 percent of the time.

242. Flights taking off from runway 15/33 fly over parcel BB approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel BB approximately 30 percent of the time.

243. In 1980, noise levels on parcel BB ranged from 75–80 DNL.

244. By 1981, parcel BB did not have a highest and best use as residential property.

245. Noise levels over parcel BB did not substantially increase after July 15, 1982.

246. The number of actual flights by jet aircraft over parcel BB in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

247. A.C. Lopez obtained title to parcel BB by warranty deed dated June 7, 1984.

248. At the time Mr. Lopez obtained titled, parcel BB was subject to a flight easement recorded in Volume 4061, page 501 Deed Records of Bexar County, Texas; there was no evidence in the record regarding the extent of this easement.

249. Parcel CC is a 4.00 acre parcel located southeast of KAFB in APZ1; the parties did not stipulate to ownership of this parcel and there was no evidence on this issue at trial.

250. Flights taking off from runway 15/33 fly over parcel CC approximately 70 percent of the time; flights landing on

APPENDIX—Continued

runway 15/33 fly over parcel CC approximately 30 percent of the time.

251. In 1980, noise levels on parcel CC ranged from 75–80 DNL.

252. By 1981, parcel CC did not have a highest and best use as residential property.

253. Noise levels over parcel CC did not substantially increase after July 15, 1982.

254. The number of actual flights by jet aircraft over parcel CC in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

255. Parcel DD is a .201 acre parcel located southeast of KAFB in APZ1 south; it is owned by Helaman R. Duran and Irene L. Duran.

256. Flights taking off from runway 15/33 fly over parcel DD approximately 70 percent of the time; flights landing on runway 15/33 fly over parcel DD approximately 30 percent of the time.

257. In 1980, noise levels on parcel DD were above 80 DNL.

258. By 1981, parcel DD did not have a highest and best use as residential property.

259. Noise levels over parcel DD did not substantially increase after July 15, 1982.

260. The number of actual flights by jet aircraft over parcel DD in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

261. Parcel FF is part of a 17.180 acre tract located northwest of KAFB; the easternmost 8.923 acres are located in APZ1 north.

262. Flights taking off from runway 15/33 fly over parcel FF approximately 30 percent of the time; flights landing on runway 15/33 fly over parcel FF approximately 70 percent of the time.

263. Parcel FF is owned by the estates of Joe Centeno, Sr., Dec'd, and Jesusa Centeno, Dec'd.

264. In 1980, noise levels on parcel FF ranged from 75–80 DNL.

APPENDIX—Continued

265. By 1981, parcel FF did not have a highest and best use as residential property.

266. Noise levels over parcel FF did not substantially increase after July 15, 1982.

267. The number of actual flights by jet aircraft over parcel FF in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

268. Parcel GG is part of a 35.17 acre tract northwest of KAFB; 31.373 acres are located in APZ2 north.

269. Flights taking off from runway 15/33 fly over parcel GG approximately 30 percent of the time; flights landing on runway 15/33 fly over parcel GG approximately 70 percent of the time.

270. Parcel GG is jointly owned by Margaret Thienpont, Aline Oyer and Marie Decock.

271. In 1980, noise levels on parcel GG ranged from 70–80 DNL.

272. By 1981, parcel GG did not have a highest and best use as residential property.

273. Noise levels over parcel GG did not substantially increase after July 15, 1982.

274. The number of actual flights by jet aircraft over parcel GG in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

275. Parcel HH is part of a 48.123 acre parcel located northwest of KAFB; 43.352 acres are located in APZ2 north.

276. Flights taking off from runway 15/33 fly over parcel HH approximately 30 percent of the time; flights landing on runway 15/33 fly over parcel HH approximately 70 percent of the time.

277. Plaintiff Terry Britton purchased parcel HH on or about 1980 for a price of approximately $6,500/acre.

278. In 1980, noise levels on parcel HH ranged from 70–80 DNL.

279. Noise levels over parcel HH did not substantially increase after July 15, 1982.

APPENDIX—Continued

280. The number of actual flights by jet aircraft over parcel HH in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

281. In 1984, Robert Cadena, John Miller and Comcal Group purchased tract HH for a price of approximately $.68 per square foot.

282. In March 1985, the Mexican American Unity Council, Inc. obtained an option to purchase tract HH; the option expired if not executed by October 31, 1995.

283. Under the terms of the option the buyer had the right to cancel the option at any time during its term in the event the property did "not prove satisfactory for Buyer's intended use, in Buyer's sole discretion and opinion."

284. The Mexican American Unity Council, Inc. did not exercise its option to purchase tract HH.

285. Overflights of aircraft from KAFB did not substantially interfere with the use and enjoyment of parcel HH for industrial purposes after 1984.

286. Parcel II consists of 5.477 acres located southeast of KAFB in APZ2 south.

287. Parcel II is jointly owned by J.L. Guerra, Jr., Independent Executor of the Estate of J.L. Guerra, Sr., Dec'd, and Herminia L. Guerra.

288. In 1980, noise levels on parcel II ranged from 70–75 DNL.

289. By 1981, parcel II did not have a highest and best use as residential property.

290. Noise levels over parcel II did not substantially increase after July 15, 1982.

291. The number of actual flights by jet aircraft over parcel II in 1980 was greater than the actual flights in 1983 or the projected flights after 1986.

## CONCLUSIONS OF LAW

Upon these findings of fact, which are made part of this judgment, the court concludes that plaintiffs are not entitled to recover for the taking of avigation easements over the subject properties and their claims are dismissed.

APPENDIX—Continued